717 So.2d 234 (1998)
STATE of Louisiana
v.
Antoine SANDERS.
No. 97-KA-892.
Court of Appeal of Louisiana, Fifth Circuit.
March 25, 1998.
Writ Denied September 25, 1998.
*236 Fredrick Kroenke, Baton Rouge, for Defendant/Appellant.
Paul D. Connick, Jr., District Attorney, Alison Wallis, Assistant District Attorney, Gretna, for Plaintiff/Appellee.
Before GRISBAUM, BOWES and DALEY, JJ.
DALEY, Judge.
Defendant, Antoine Sanders, appeals his conviction by a jury of possession of cocaine. On appeal, he assigns as error the trial court's denial of his Motion to Suppress Evidence. Defendant also filed a pro se Supplemental Brief alleging several assignments of error. We affirm, and remand with instructions for defendant to be notified regarding the time limits for applying for post conviction relief.
The Jefferson Parish District Attorney filed a Bill of Information on August 19, 1996, charging defendant, Antoine Sanders, with one count of possession of cocaine in violation of LSA-R.S. 40:967(C) and one count of battery on a police officer producing an injury requiring medical attention in violation of LSA-R.S. 14:34.2.[1] At the September 25, 1996 arraignment, defendant pled not guilty.
On October 21, 1996, the trial judge, Judge Zeno, recused himself on the court's own motion. On December 3, 1996, the defendant filed a Motion to Recuse Assistant District Attorney Robert Grant. The matter was heard on December 12, 1996, and the trial judge denied the motion on December 19, 1997. On February 25, 1997, the defendant filed a Motion to Recuse Judge McManus. Although the trial judge found that there were no grounds to support recusal and denied the motion, the judge nevertheless referred the motion to Judge Cusimano, who denied Mr. Sanders' motion. Also, on February 25, 1997, the trial court denied Mr. Sanders' Motion to Suppress the Statement and Evidence.
On February 26, 1997, Mr. Sanders was tried before a six-person jury, who found Mr. Sanders guilty of possession of cocaine. The jurors were polled and the trial judge accepted the verdict as the judgment of the court.
On March 11, 1997, Mr. Sanders filed a Motion for New Trial and a Motion for Lesser Verdict or Judgment of Acquittal. On April 22, 1997, the trial judge denied both of these motions.
On March 20, 1997, the state filed a habitual Bill of Information alleging Mr. Sanders to be a fourth felony offender. On May 22, 1997, the state agreed to amend this Bill of Information to reflect that Mr. Sanders would be charged as a second felony offender. The state also agreed to drop the second count of the original Bill of Information, battery on a police officer producing injury requiring medical attention. After being advised of his right to remain silent and the right to a hearing, Mr. Sanders stipulated that he was a second felony offender. He also executed a Waiver of Rights form in connection with this plea. The trial judge then sentenced Mr. Sanders to serve ten years at hard labor, without benefit of probation or suspension of sentence.[2]
On May 27, 1997, and on May 30, 1997, Mr. Sanders filed a Motion to Reconsider Sentence, which the trial judge denied on July 7, 1997.[3] On May 27, 1997, Mr. Sanders filed a Motion for Appeal, which the trial judge granted on June 2, 1997. On July 7, 1997, Mr. Sanders filed another Motion for Appeal, which the trial judge granted on the same day.

FACTS
At the suppression hearing, Deputy Charles Arnold of the Jefferson Parish Sheriff's Office testified regarding the circumstances that led to the arrest of Mr. Antoine *237 Sanders. Deputy Arnold testified that at 3:00 a.m. on July 31, 1996, he was patrolling the Second District area, which encompasses Gretna and Harvey. The officer testified that he knew this neighborhood as a high crime area where vehicle burglaries and thefts frequently occurred. He observed a white truck parked in the driveway of an apartment complex at the corner of Clydesbank and Angus. The truck's passenger door was open and the deputy was unable to see anybody inside of the truck. Finding these circumstances to be suspicious, Deputy Arnold turned on his overhead lights and pointed his spotlight at the back of the truck. As Deputy Arnold exited his vehicle and was walking toward the truck, a black male got out of the driver's side of the truck and a second black male exited from the passenger's side. Deputy Arnold asked for their names, and the driver said that he was "Louis Collins" and Antoine Sanders said that his name was "John Sanders." Neither of the men could produce any identification or any ownership papers for the truck. He asked if either of them had been arrested before and "John Sanders" said that he had. Deputy Arnold ran these names through the NCIC computer, but there was no record of arrest for either name. Deputy Arnold testified that he found this to be suspicious because "John Sanders" had told him that he had a prior arrest. The officer further testified that he suspected that he had been given a false name. At this point, Deputy Arnold decided to pat-down both men for his safety.
Deputy Arnold patted down Louis Collins without incident. But, as he was patting Antoine Sanders down, he felt a "big bulge" in Mr. Sanders' right front pocket. The deputy testified that he "didn't know what was in the pocket," that he "didn't know if it was a weapon or what." Deputy Arnold then started to reach into the pocket to discover what the bulge was. Mr. Sanders then asked the deputy what he was doing, and Deputy Arnold told defendant to "calm down." Mr. Sanders pushed Deputy Arnold away from him and Deputy Arnold lost his balance and fell backwards. At the same time, Deputy Arnold saw Mr. Sanders reach into his pocket and throw down numerous rock-like substances. After a brief struggle, Deputy Arnold brought Mr. Sanders to the ground, secured him in handcuffs, and called for backup. Several officers arrived, one of whom brought Mr. Sanders to Deputy Arnold's unit. Deputy Arnold stayed in the area where he had observed Mr. Sanders throw down the rock-like substances and he searched the ground. He found three offwhite rock-like substances.
Mr. Sanders was then arrested and searched incident to arrest. Deputy Arnold testified that he recovered two shotgun shells from Mr. Sanders' front right pocket, which was the "bulge" he had felt during the patdown. Deputy Arnold also found his real identification in his pocket. Mr. Sanders was advised of his constitutional rights and placed in Deputy Arnold's patrol unit. While Deputy Arnold was driving Mr. Sanders to the jail, Arnold testified Mr. Sanders "spit" on the cage in the unit, and told Deputy Arnold that he should not have let the deputy handcuff him, and that if he had been able to get to his gun, he would have shot the deputy.
On cross-examination, Deputy Arnold testified that he was not responding to any calls or complaints at the time that he saw the parked truck. He also testified that the truck was not stolen and that neither Mr. Sanders nor Collins had done anything to indicate that they were involved in criminal activity. Finally, he testified that he performed the pat-down of both men for "officer safety" and because they did not exit the truck until he was half-way to their truck, because neither of them could provide identification for themselves or papers for the truck, and because the computer check did not reflect that Mr. Sanders had been arrested before, even though he stated that he had a prior arrest.
At the suppression hearing, the defense presented the testimony of three witnesses: defendants, Antoine Sanders; Terrance Vance; and Claudette Allen. Antoine Sanders testified that he and Louis Collins had just come from Boomtown Casino and were sitting in the truck talking when the officer pulled up. He explained that the truck door was open because he was preparing to exit the truck when the officer pulled up. Mr. *238 Sanders stated that the officer told them to get out of the truck. He asked the officer if anyone had called for the police, and the officer replied negatively. Mr. Sanders told the officer that he lived in the apartments and that the officer could "just go." Mr. Sanders said that the officer told him that he was the "F'n police" and that he would do what he wanted. At first, Mr. Sanders allowed the officer to pat him down, and even raised his shirt for the officer, but then he told the officer that he was "sick of this" and was going inside. The officer then "tripped" Mr. Sanders and handcuffed him. Mr. Sanders further stated that he did not put his hands in his pocket at any time.
Mr. Sanders testified that more police officers arrived and became "excited" once they found the shotgun shells that he had in his pocket. Mr. Sanders said that his friend whom he was with [Louis Collins] had just given him the shells, and that he explained to the police that he liked to hunt. Mr. Sanders stated that while he was handcuffed, the officers searched him and pulled his pants and underwear down. Mr. Sanders testified that he shouted for help, and his family, who lives in the same building as him, came outside.
On cross-examination at the suppression hearing, Mr. Sanders testified that he gave his address that night as 5012 Highland Drive, not 1153 Clydesbank, the address of the apartments where he was arrested. Mr. Sanders stated that the Highland address was his mother's address and that he used it as his mailing address.
The defense also presented the testimony of Terrance Vance, who was sixteen years old at the time of the hearing. He testified that he lived in apartment "B" at 1153 Clydesbank. He stated that Mr. Sanders' mother owned the apartments and that Mr. Sanders lived in apartment "A." He testified that he was sitting by the window talking on the phone at 3:00 a.m. on July 31, 1996. He said that he saw a truck pull up, and then saw a police car stop. He heard the officer ask the occupants of the truck some questions, and then saw Mr. Sanders and another man exit the truck. According to Vance, the officer was about to place the two men against the car, when he heard Mr. Sanders ask the officer if someone had called him, and the officer replied negatively. Mr. Sanders asked the officer what he was doing on private property, and the officer told him that he was a police officer. Mr. Sanders attempted to walk away, but the officer "tripped" defendant on the ground and then handcuffed him. Vance testified that he did not see Mr. Sanders throw anything to the ground. After observing this, he called his "Auntie," who called Mr. Sanders' mother. On cross-examination, Vance testified that his apartment was downstairs and that the scene was about seventy feet from the window.
The last witness to testify for the defense at the suppression hearing was Claudette Allen. She stated that she was not acquainted with Mr. Sanders, but that she was at Apartment 12-C that night visiting a woman she knew only as "Kathy" and doing her hair. At approximately 3:00 a.m., she saw the police stop Mr. Sanders and heard him tell the officer to get off of his property. She saw the officer throw Mr. Sanders to the ground and handcuff him. After seeing this, she went back inside the apartment.
After the testimony of all of the witnesses and argument by counsel, the trial court denied the Motion to Suppress the Evidence and the Statement without stating any reasons.
At trial, the state presented the testimony of Agents Gorman and Wolkart who testified regarding the chain of custody of state's Exhibit One, three off-white rocks. Darrin Poche was accepted at trial as an expert in the field of analyzing controlled dangerous substances. He testified that state's Exhibit One tested positive for the presence of cocaine. The state also presented the testimony of Deputy Charles Arnold.
Terrance Vance and Claudette Allen also testified at trial for the defense. The defense presented three additional witnesses. Defense witness Frank Mistretta, a private investigator, identified defense Exhibit One, a computer printout that he obtained from the Jefferson Parish Sheriff's Office Crime Statistics Office. Mr. Mistretta testified that *239 the printout represented every call for service that the Sheriff's Office received from January 1, 1996, to December 18, 1996, for the Clydesbank area. Mr. Mistretta testified that there were 1703 calls from January 1, 1996, to July 31, 1996, and only 2.8 percent of the calls were for automobile thefts and burglaries.
Mr. Mistretta also identified defense Exhibit Two, in globo, as three photographs of the Clydesbank apartment complex that he took on February 12, 1997. Terrance Vance testified that the photographs were of the apartment complex were he lived. On photograph "A," he drew a circle around the window out of which he was looking, and an "X" on the spot where the truck was parked that night. These photographs were admitted only for the purpose of showing where the vehicles were located.
John Sanders, Antoine Sanders' brother, testified that he went outside at 3:00 a.m. on July 31, 1996, and saw Antoine on the ground "with the police in his back." He stated that the police told him to stay away. Betty Sanders, Antoine Sanders' mother, testified that Antoine was already in the police car when she arrived on the scene. She told the police that Antoine Sanders was her son and that the apartment complex was her property, but they told her to get back before she was arrested.
The state presented two rebuttal witnesses. Lt. Cantrell, the Commander of the Burglary/Theft Division in Jefferson Parish, testified that there were thirty-five reported burglaries between January 1, 1996, and July 31, 1996, in the Clydesbank and Angus area. Twenty of these burglaries were vehicle burglaries and the rest were residential burglaries. Lt. Cantrell stated that he considered this to be a high number of burglaries for that small of an area.
The state's other rebuttal witness, Officer Michael Kinler, testified that he was with Deputy Arnold when he found the rocks. He testified that the rocks appeared to be "fresh," not dirty as would be expected if the rocks had been on the ground for some time. He also stated that Mr. Sanders was "checked thoroughly" to make sure that nothing was concealed in "common places, such as in the underwear, the crotch area, in the back, a lot of times in the buttocks." He said that they did a search like that, but maintained Mr. Sanders' privacy by surrounding him with male officers.
After hearing the testimony and considering the evidence, the jury found defendant guilty of possession of cocaine.

ASSIGNMENT OF ERROR NUMBER ONE
Mr. Sanders contends that the trial court improperly refused to suppress the cocaine allegedly discarded during an unlawful frisk. He argues that the investigatory stop and the subsequent frisk were unlawful on the grounds that the officer had no reasonable suspicion sufficient to justify either the stop or the frisk.
The state responds that the stop was justified because the officer was entitled to make the investigatory stop after observing what could have been a vehicle burglary in progress. The state further responds that the frisk was justified because the officer was alone in the dark in a high crime area with two suspects, neither of whom could produce any personal identification or ownership papers for the truck in which they were sitting.
The Fourth Amendment to the United States Constitution and Article 1, § 5 of the Louisiana Constitution protect individuals from unreasonable searches and seizures. State v. Belton, 441 So.2d 1195, 1198 (La. 1983), cert. denied, 466 U.S. 953, 104 S.Ct. 2158, 80 L.Ed.2d 543 (1984). The right of law enforcement officers to stop and question a person where there is reasonable suspicion to believe that the person is committing, has committed or is about to commit a crime was established in the landmark case of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and is recognized by state and federal jurisprudence. State v. Keller, 403 So.2d 693, 697 (La.1981); State v. Duran, 96-602, p. 2 (La.App. 5 Cir. 3/25/97), 693 So.2d 2, 3.
The Terry "reasonable suspicion" test has been codified in LSA-C.Cr.P. art. 215.1, and provides in pertinent part:

*240 A. A law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions.
* * * * * *
Reasonable suspicion for an investigatory stop is something less than probable cause and must be determined under the facts of each case by whether the officer had sufficient knowledge of facts and circumstances to justify an infringement on the individual's right to be free from governmental interference. State v. Wade, 390 So.2d 1309, 1311 (La.1980), cert. denied, 451 U.S. 989, 101 S.Ct. 2326, 68 L.Ed.2d 848 (1981); State v. Short, 95-742, p. 9 (La.App. 5 Cir. 1/30/96), 668 So.2d 1240, 1244.
A law enforcement officer must be able to point to specific and articulable facts to justify an investigatory stop and these facts should be evaluated in light of the circumstances surrounding the incident. State v. Davis, 547 So.2d 1367, 1375 (La.App. 5 Cir.1989), writ denied, 556 So.2d 53 (La. 1990). The reputation of an area is an articulable fact upon which a police officer may legitimately rely and which is relevant in a determination of whether there is reasonable suspicion to conduct an investigatory stop. State v. Miskel, 95-584, p. 5 (La.App. 5 Cir. 1/30/96), 668 So.2d 1299, 1302. This is because high crime areas are places in which the character of the area gives color to conduct which might not otherwise arouse the suspicions of an officer. Id.
A court's inquiry into the existence of reasonable suspicion should entail practical consideration of the cumulative effect of all facts articulated by the officer, further taking into account the probative value of such facts to the trained law enforcement official observing them. State v. Short, 668 So.2d at 1245. In order to determine whether reasonable suspicion exists, the totality of the circumstances, "the whole picture," must be considered. State v. Kalie, 96-2650, p. 2 (La.9/19/97), 699 So.2d 879; State v. Belton, 441 So.2d at 1198. Any attempt to refine this "totality of the circumstances" standard for reasonable suspicion is invalid. State v. Davis, supra.
In his brief, defendant contends that Deputy Arnold did not have reasonable suspicion sufficient to justify the investigatory stop. At the suppression hearing, Deputy Arnold testified that he was patrolling the area of Clydesbank and Angus, an area known to him to be a high crime area, particularly vehicle thefts and burglaries. He observed a white truck parked in the driveway of an apartment complex with the passenger's side door open. The officer did not see anyone in the truck and stopped to investigate.
Under similar circumstances, in State v. Keller, 403 So.2d 693 (La.1981) the Louisiana Supreme Court upheld an investigatory stop where the officer observed a car that was parked in a high crime area of New Orleans at 3:00 a.m. Defendant was slumped over the steering wheel, the motor of the car was running, the lights were on, and music was playing from inside of the car. The officer stopped to investigate. The Keller court noted that the facts did not fall specifically within the rationale of Terry and its progeny, but held that under these circumstances, the officer was entitled to further investigate the situation. Keller, at 698.
In the present case, like the officer in Keller, supra, Deputy Arnold observed a scene that caused him to stop and investigate. Deputy Arnold saw a truck parked in the driveway of an apartment complex at 3:00 a.m. in a high crime area known to have a large number of automobile burglaries. The truck's door was open and he did not see anyone inside of the truck. Considering the totality of the circumstances, it appears that Deputy Arnold had reasonable suspicion of criminal activity sufficient to justify the investigatory stop.
When a police officer observes conduct which leads him to reasonably conclude that criminal activity may be afoot and that the persons with whom he is dealing may be armed and dangerous, he is, in the course of the investigatory stop, entitled to conduct a carefully limited search to discover weapons that might be used to assault him. Terry v. *241 Ohio, 88 S.Ct. at 1884-1885; State v. Tolliver, 556 So.2d 166, 169 (La.App. 5 Cir.1990). The pat down is justified under circumstances where a reasonably prudent man would be warranted in the belief that his safety or that or others was in danger. State v. Mitchell, 96-999, p. 3 (La.App. 5 Cir. 3/25/97), 692 So.2d 1251, 1252. The officer's belief is not reasonable unless the officer can point to particular facts from which he reasonably inferred that the individual was armed and dangerous. Sibron v. New York, 392 U.S. 40, 64, 88 S.Ct. 1889, 1903, 20 L.Ed.2d 917, 935 (1968). It is not necessary that the officer establish that it was more probable than not that the detained individual was armed and dangerous; it is sufficient that the officer establish a substantial possibility of danger. State v. Hunter, 375 So.2d 99, 102 (La.1979); State v. Mitchell, supra.
Paragraph B of LSA-C.Cr.P. art 215.1 codifies this principle and provides in pertinent part:
B. When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person.
* * * * * *
This pat down search allows officers to neutralize a potential conflict prior to the crisis stage. Tolliver, supra. Moreover, there is often an overlap between the grounds that justify the investigatory stop and the subsequent frisk, and in many situations, the circumstances that justify the stop also justify the frisk. State v. Wade, 390 So.2d at 1312.
In State v. Edwards, 630 So.2d 302 (La. App. 5 Cir.1993), this Court upheld a pat down under similar circumstances. In that case, a lone officer saw a truck parked on the shoulder of the road at approximately 4:18 a.m. The truck was occupied by two men who appeared to be sleeping and the passenger had an open bottle of beer in his lap. After the officer finally succeeded in waking the men, the officer asked for identification. The officer ran a computer check on both of the men's names. The computer check on defendant's name revealed that he had a prior conviction for murder. At that point, the officer ordered defendant to exit the truck so that he could perform a pat down. This Court upheld the pat down. The Edwards court stated that "[g]iven the knowledge obtained by Officer Smith that the defendant was a convicted murderer, we find that a pat down search was justified." Edwards, at 305.
Here, as in Edwards, Deputy Arnold was alone in the early hours of the morning with two suspects. Neither of these individuals could produce any identification or ownership papers for the truck. Defendant gave Deputy Arnold a different address than the address for the apartment complex. Furthermore, the computer check that Deputy Arnold ran on "John Sanders," the name that defendant gave him, indicated no prior criminal background under that name, even though defendant told the deputy that he had a prior arrest. Deputy Arnold believed that defendant had given him a false name, and patted defendant down for the officer's safety. Considering all of these circumstances, the officer was justified in conducting the pat down of defendant. The next issue, then, is whether the cocaine that defendant threw down was improperly seized.
When property is abandoned without any prior unlawful intrusion into a person's right to be free from governmental interference, that property may be lawfully seized. State v. Short, 95-742, p. 13 (La.App. 5 Cir. 1/30/96), 668 So.2d 1240, 1245. In such cases there is no expectation of privacy and thus no violation of the person's custodial rights. Only when the person is actually stopped without reasonable cause or when a stop without reasonable cause is imminent, is the right to be left alone violated, thereby rendering unlawful any resultant seizure of abandoned property. State v. Belton, 441 So.2d at 1199.
We have found that Deputy Arnold had the requisite reasonable suspicion to perform the investigatory stop and frisk. As *242 such, since the stop was not unlawful, the cocaine abandoned during the lawful stop was legally seized. This assignment of error has no merit.
Defendant also contends that he was actually "seized" within the meaning of the Fourth Amendment prior to abandoning the cocaine. He contends that his alleged abandonment of the cocaine was triggered by an unlawful "seizure" within the meaning of these constitutional provisions. In support of this contention, he relies on California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991) and the Louisiana Supreme Court's interpretation of that case in State v. Tucker, 626 So.2d 707 (La.), opinion reinstated on rehearing, 626 So.2d 720 (La. 1993).
In Hodari D., the United States Supreme Court delineated the point in time at which a person is actually "seized" within the meaning of the Fourth Amendment. The Hodari D. court held that a person is not seized until he either submits to the police show of authority or is physically contacted by the police. Hodari D., 499 U.S. at 626, 111 S.Ct. at 1551. Although defendant urges that the initial encounter with the Deputy Arnold was an actual "seizure," the evidence presented at the suppression hearing and at trial show that the encounter was a frisk supported by reasonable suspicion performed after a valid investigatory stop. It is undisputed that Sanders submitted to the patdown performed by Deputy Arnold. Therefore, Hodari D.'s analysis as to when a stop actually occurs is not an issue in this case.
Mr. Sanders raises additional assignments of error in a pro se Supplemental Brief. He argues that the trial court erred in denying his Motion to Recuse prosecutor Robert Grant, erred in denying his Motion to Suppress Evidence of the shotgun shells and his threats to the arresting police officer, erred in denying his challenge of one juror for cause, erred in denying his Batson challenge to the prosecution's use of peremptory challenges, erred in refusing to allow demonstrative evidence, erred in allowing the jury to hear evidence of Mr. Sanders' prior conviction when he did not take the stand, erred in denying his Motion for New Trial, and erred in denying his Motion to Reconsider Sentence.
Regarding the Motion to Recuse Assistant District Attorney Robert Grant, we find that the trial court conducted a thorough hearing into the substance of this motion, and specifically found no bias on the part of the prosecutor. After considering the transcript of this hearing, we agree with the trial court's conclusions. This assignment of error has no merit.
Regarding the second assignment of error, we note that possession of shotgun shells is not a crime. Admission of the facts of Mr. Sanders' possession of these items, along with the admission that Mr. Sanders' engaged in several verbal threats of the arresting officer, was properly admitted as res gestae recitation of the facts of this encounter.
Mr. Sanders alleges the trial court erred in refusing to allow him to challenge for cause a black juror. Specifically, Mr. Sanders argues that he used his last peremptory challenge to dismiss a white juror who professed having a problem with a defendant who did not take the stand in his own defense, but then the court did not allow Sanders to challenge for cause another, black, juror who stated the same problem. A review of the transcript shows that the defense used its last peremptory challenge to dismiss juror Wieland. It appears that the black juror whom Mr. Sanders desired to challenge for cause is juror Lambert, but the transcript shows that defense counsel did not attempt to challenge this juror for cause or for any other reason, and does not note an objection to his placement on the jury. This assignment has no merit.
Mr. Sanders next argues that the trial court erred in denying his Batson[4] challenge regarding two prospective black jurors who were dismissed subject to peremptory challenges by the prosecution. The Louisiana Supreme Court, in State v. Green, 94-887 (La.5/22/95), 655 So.2d 272 (footnotes omitted), *243 has stated the following with respect to Batson challenges:
In Batson the Supreme Court adopted a three-step analysis to determine whether the constitutional rights of prospective jurors have been infringed by impermissible discriminatory practices:
First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. Second, if the requisite showing has been made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the jurors in question. Finally, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination.
The prosecutor found one juror inattentive and sleepy, which the defense denied. The second juror was peremptorily challenged because her husband and his family visit a relative of the husband's in the Jefferson Parish Correctional Center. The trial court found that both of these reasons were race neutral. We agree. Mr. Sanders does not appeal the prosecution's use of peremptory challenges of two other black prospective jurors. We further note that a black juror was accepted to the panel and served as a juror. We find no merit in this assignment of error.
Mr. Sanders argues next that the trial court erred in denying him the opportunity to present demonstrative evidence, but he does not argue in what way this prejudiced him. Nor does he specifically argue what demonstrative evidence the trial court failed to let him present. This assignment of error has no merit.
Mr. Sanders argues that his Motion for New Trial was improperly denied considering the police officer testified to other crimes evidence, the threats and assault made on the arresting officer, in violation of State v. Prieur, 277 So.2d 126 (La.1973), and the prosecution referred to this evidence in its closing argument in violation of LSA-C.Cr.P.art.770. First, we note that "other crimes evidence" within the meaning of State v. Prieur does not include res gestae events. The evidence Mr. Sanders protests reference to is res gestae evidence. We find no merit in this assignment of error.
Mr. Sanders argues that the trial court erred in denying his Motion to Reconsider Sentence. He argues that the sentence is excessive, and that the trial court failed to consider mitigating factors. Further, Mr. Sanders argues that the conviction used to enhance his sentence was used in violation of LSA-R.S. 15:529.1, because Mr. Sanders conditionally pled guilty to the predicate offense in accordance with "CDC Sec. D".
The record shows that until Mr. Sanders argued his Motion to Reconsider Sentence, the court was unaware of the allegedly conditional nature of the plea to the predicate offense. The transcript indicates that Mr. Sanders offered into evidence a certified copy of this conditional plea, admitted as Defense #1.
A review of this exhibit shows that in Criminal District Court in Orleans Parish on September 6, 1995, in proceeding 368-627 Mr. Sanders pled guilty to possession of cocaine in violation of LSA-R.S. 40:967(C)(2), conditional upon the State's agreement not to bill him as a multiple offender. The basis for the possible multiple offender bill in the Orleans Parish proceeding was prior conviction in 1989 for felony theft in Jefferson Parish proceeding 86-3342.
Contrary to Mr. Sanders' assertion, the guilty plea in 368-627 was not made upon the condition that this plea could not later be used to enhance any subsequent conviction. This plea was conditioned upon the promise that Mr. Sanders not be multiple billed to enhance the sentence imposed in 368-627. This assignment has no merit.[5]
Mr. Sanders argues that the trial court erred in allowing the jury to hear of Sanders' *244 prior conviction when he did not take the stand. However, he does not state specifically exactly what information regarding his criminal past was put before the jury.
LSA-C.E. 404 governs the admission of evidence of other crimes, and states in pertinent part:
B. Other crimes, wrongs, or acts. (1)Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
We assume Mr. Sanders objects to the mention of a prior arrest. Deputy Arnold testified that he became suspicious of the two men because of several factors. One factor was that upon questioning them, he asked them for their names and if they had any prior arrests. Sanders told him the name "John Sanders" and stated that he had a prior arrest. As noted above, he suspected that Sanders had given him a false name because when he ran the name "John Sanders" through the computer, it came back with no prior arrests. This information about the encounter was important to establish the factual basis that Deputy Arnold had for his reasonable suspicion that the men were engaging in criminal activity to warrant the stop and frisk.
LSA-C.E. art. 404 states that other crimes evidence may be admitted for purposes other than to attack the character of the accused. The fact that Sanders gave a suspected false name to the deputy was revealed when he reported an arrest record that did not match the name he gave to the deputy. We find that Mr. Sanders' criminal past was not introduced to make the jury believe he was a bad man, but rather that information was an integral part of Deputy Arnold's fact basis for his reasonable suspicion for the stop and frisk. As such, the introduction of this evidence was admissable.

ERROR PATENT DISCUSSION
The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990); and State v. Godejohn, 425 So.2d 750 (La. 1983).
The record reflects that Mr. Sanders was not advised of the three-year time limit for filing an Application for Post Conviction Relief as required by LSA-C.Cr.P. art. 930.8. Therefore, we order the trial court to send written notice to the Mr. Sanders within ten days of the rendering of this Court's opinion, then filing written proof in the record that the Mr. Sanders received such notice. State v. Kershaw, 94-141, p. 4 (La.App. 5 Cir. 9/14/94), 643 So.2d 1289, 1291.
The conviction is affirmed. The matter is remanded with instructions for the trial court to notify Mr. Sanders as per the preceding paragraph.
AFFIRMED; REMANDED WITH INSTRUCTIONS.
NOTES
[1] Count 2LSA-R.S. 14:34.2 was severed on the day of trial.
[2] Although defendant had not been sentenced before the trial court imposed the enhanced sentence, the trial court's failure to sentence defendant before imposing an enhanced sentence poses no problem because LSA-R.S. 15:529.1(D)(3) provides that the "court shall sentence him [defendant] to the punishment prescribed in this Section, and shall vacate the previous sentence if already imposed..." [emphasis added].
[3] The record as lodged with this Court does not appear to contain a minute entry for this date.
[4] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[5] In 368-627, it appears that the prosecution did file a multiple bill, apparently in violation of that plea agreement. From the incomplete Fourth Circuit writ opinion supplied to us by defendant (95-K-2790), it appears that the trial court found that the multiple bill filed by the State was expired because defendant had been released prior to its filing. The State applied for review to the Fourth Circuit; writs were denied.