765 So.2d 1155 (2000)
STATE of Louisiana
v.
Patrick PALERMO.
No. 99-KA-1255.
Court of Appeal of Louisiana, Fifth Circuit.
July 25, 2000.
*1157 Paul D. Connick, District Attorney, Terry M. Boudreaux, Alison Wallis, Richard Bates, Joseph Roberts, Assistant District Attorneys, Courthouse Annex, 5 th Floor, Gretna, Louisiana, Honorable Richard P. Ieyoub, Attorney General, Louisiana Department of Justice, Baton Rouge, Louisiana, Counsel for the State of Louisiana.
Katherine M. Franks, Baton Rouge, Louisiana, Counsel for appellant.
Court Composed of Judges EDWARD A. DUFRESNE, Jr., CLARENCE E. McMANUS and THOMAS C., WICKER, Jr., Pro Tempore.
McMANUS, Judge.
This appeal arises from the conviction and sentence of Patrick Palermo,[1] for placing combustible materials. LSA-R.S.14:54. Defendant was charged with a three-count bill of information along with Frank Palermo,[2] the co-defendant, but was only found guilty of one count. He was *1158 charged with two counts of Hate Crimes, because of race, and one count of placing combustibles. LSA-R.S. 14:107.2A and LSA-R.S. 14:54, respectively. Defendant entered a plea of not guilty. Defendants were jointly tried before a jury, but the cases were not consolidated. Defendant's post-trial motions for new trial, post verdict judgment of acquittal, and motion in arrest of judgment were denied. The trial judge sentenced defendant to three years at hard labor for the offense of placing combustible materials, with two years of the sentence being without the benefit of probation, parole, or suspension of sentence, to run concurrent with any other time.[3]
The State filed a habitual offender bill of information, alleging that defendant was a second felony offender. Defendant admitted the allegations in the multiple bill, and the trial judge adjudicated him to be a multiple offender. Thereafter, the trial judge vacated the prior sentence, and sentenced defendant to five years at hard labor, with credit for time served. Defendant filed a timely motion for appeal. He now assigns errors which raise the following issues on appeal: (1) LSA-R.S.14:54 is not a valid offense; (2) the trial judge erred in charging the jury to return a verdict after they indicated they had a deadlock; (3) the trial judge erred in failing to advise defendant of his right to remain silent during the habitual offender proceeding; (4) the trial judge erred in failing to advise him of statutory delays for filing post-conviction relief; and (5) the evidence was insufficient.
The seminal issue before this court is res nova: Does LSA-R.S. 14:54 charge a non-crime? Stated differently, is defendant's conviction of LSA-R.S. 14:54 a conviction stemming from a non-chargeable offense? We first address the fundamental basis of the conviction. Principles of statutory construction and constitutional law convince us the statute does charge a crime. We also conclude that with the exception of the assignments relative to the habitual offender proceeding and the failure to advise defendant of the period for filing for post-conviction relief, the remaining arguments lack merit and we affirm the convictions. We vacate the habitual offender adjudication and remand for a rehearing and resentencing on the multiple bill. We also find a non-reversible error patent requiring that we amend the commitment to conform to the transcript.

FACTS[4]
On September 9, 1998, defendant and co-defendant (brothers/white males), allegedly initiated racially inspired altercations against Curtis Briggs (Briggs), and Frank Taylor, the African-American victims. The incidents between the brothers and the victims escalated, culminating in Frank Palermo's allegedly pouring gasoline on the victims' vehicles with the intent to set the automobiles on fire, while one of the vehicles was occupied by Briggs' son, Carnell Kelly (Kelly),[5] who was nearly three years of age.
The two alleged victims and the child traveled in Tony Taylor's Honda Accord to the Westbank of Jefferson Parish in order to purchase an automobile for Briggs. After the sale, Briggs' newly-purchased 1983 Cutlass Supreme broke down on the Westbank Expressway. Briggs went to get gasoline and encountered Tony Taylor, a mechanic, who arrived later at the scene to render assistance.
*1159 The Briggs-Frank Taylor version of the facts was presented by the victims, and Tony Taylor, as follows.
According to Frank Taylor, while Briggs was gone, another vehicle, driven by defendant, in which Frank Palermo was the passenger, stopped. The co-defendant pointed his middle finger in the victim's direction, cursing the victim and calling the victim "nigger." Frank Palermo further addressed the victim as "bitch-made nigger." The victim responded by pointing his middle finger toward Frank Palermo. After the gesture, the co-defendant unsuccessfully tried to exit the vehicle, but he was impeded by the flow of traffic. Frank Palermo instructed Patrick Palermo to drive around the corner, and return in order to "get" the victims. When the Palermo brothers returned, Briggs was present.
The brothers were angry and wanted to fight. Briggs and Frank Taylor testified the Palermo brothers exited the vehicle, cursed the victims with racial slurs, and initiated an unprovoked attack. Frank Taylor testified Frank Palermo, upon exiting the vehicle, came toward him (Frank Taylor) remarking,
"Who are you pointing your finger at now, nigger?... You want to fight now? Let's do this right here and right now... Let's fight right now, nigger[.]"
Defendant chased Frank Taylor, urging Frank Taylor to fight. Meanwhile, Frank Palermo approached Briggs and asked,
"What you looking at, nigger? You want to fight? You want some of me now? You want to do something, because you ain't nothing. You ain't nothing but a little nigger and you ain't going to do nothing to me."
Frank Taylor stated he did not want to fight.
Briggs testified similarly. He stated Frank Palermo used racial slurs, referring to the victims as "black bastards" or "nigger." Briggs told the Palermo brothers he (Briggs) did not want any trouble. Frank Palermo responded by following Briggs as Briggs walked away.
The co-defendant said,
"No. Don't run now. Talk that shit now. What you want to do now, punk mother fucker? You punk bitch. Huh, nigger, what you going to do now?"
Briggs then waved at passing traffic for assistance. Two African-American males responded.
Briggs testified one of these men grabbed a baseball bat from their vehicle. The co-defendant ran toward the two new arrivals and a fight began. However, the victims were not involved in the altercation. After the brief altercation, the co-defendant gained possession of the baseball bat. The two new arrivals jumped into their vehicle and fled the scene. Upon leaving, Frank Palermo broke the taillight of their vehicle. Defendant, fearful of police intervention, urged his brother to leave. The brothers left the scene.
Frank Taylor testified that once the new arrivals left, the co-defendant approached the victims, swinging a baseball bat. Frank Palermo tried to break the window on Briggs' car and Briggs tried to stop him. Frank Palermo pushed Briggs to the ground. Frank Taylor went to Briggs' aid and prevented the co-defendant from swinging the baseball bat.
Prior to the next incident, Tony Taylor was at the scene, working on the disabled vehicle.
According to Briggs, when the brothers returned, the co-defendant exited the vehicle cursing Briggs, saying, "You niggers you niggers are going to pay. Somebody's going to pay today. [F] that shit." Patrick Palermo said nothing. Briggs denied using foul language or racial slurs toward the Palermos.
The co-defendant gave his brother the baseball bat while he, Frank Palermo, approached the Cutlass, grabbed the adjacent gasoline can, and threatened the victims would burn. The co-defendant *1160 poured gasoline on the Cutlass, unsuccessfully attempting to set it on fire, by making several attempts at lighting his cigarette lighter. Briggs' son was seated in the Honda, next to the Cutlass. Frank Palermo next approached the Honda. He looked into the occupied vehicle and asked, "Is someone inside of this?" Despite hearing the child's cries, the co-defendant said, "Oh, well, fuck it." He then poured gasoline on the Honda, attempting unsuccessfully to set it on fire with the cigarette lighter. According to Frank Taylor, the co-defendant was unsuccessful in igniting the vehicles because it was drizzling at the time. Frank Taylor and Briggs testified that while Frank Palermo poured gasoline on the vehicles, Patrick Palermo, who held a baseball bat, encouraged the co-defendant to pour gasoline on the cars and to set them on fire.
Briggs and Tony Taylor testified it was evident the child was in the vehicle since the boy was yelling for his father. Briggs stated he tried to remove his son from the vehicle but was prevented from doing so by the co-defendant, who pushed Briggs to the ground.
According to Briggs, after Frank Palermo failed to ignite the vehicles, he, the codefendant, abandoned the gasoline can and retrieved the baseball bat from his brother. Frank Palermo struck the Cutlass, breaking a window and the windshield. The co-defendant discarded the broken bat in the Cutlass.
Frank Taylor and Tony Taylor testified that Frank Palermo also attempted pouring gasoline on the mechanic's car. The brothers and the mechanic fought. Afterwards, Patrick Palermo expressed concern the police would arrive and prompted his brother to leave. Once again, the brothers left.
Linda Pugh testified she alerted the police to the fighting incident after she drove near the scene and specifically observed the co-defendant splash gasoline on the vehicles.
The Palermo brothers' version was recounted by Frank Palermo, and that version differed in part as follows. Frank Palermo thought the stalled car was similar to his neighbor's car. He wanted to provide assistance, but was unable to do so because of traffic. After his brother hit the horn, the co-defendant pointed to Frank Taylor, using a mannerism the co-defendant uses in greeting. In response, Frank Taylor stuck his finger at Frank Palermo. The co-defendant was unconcerned and attributed Frank Taylor's gesture as mere irritation at having broken down. Frank Palermo instructed his brother to drive around the block and return.
Upon their return, Frank Palermo approached the mechanic, offering suggestions. There, the alleged victims approached the co-defendant. Frank Taylor carried a club which is used to lock a steering wheel. Frank Taylor cursed and asked the co-defendant why the co-defendant stuck his finger at Frank Taylor. Frank Palermo denied doing so. When the co-defendant explained to Frank Taylor he thought he recognized the car, Frank Taylor responded, "No. That's bullshit. You stuck the finger at us." Frank Taylor made such statements as, "What your white ass wants." Patrick Palermo responded by saying something like, "F you, niggers."
The co-defendant explained that he and his brother use the "N" word daily in reference to each other and that the word does not have a racial connotation for the brothers. Frank Taylor became agitated and wanted to fight. At this point, two men arrived, inquiring about the problem. Frank Taylor responded, "These white M-F's they want to fight. They're giving us trouble. They're starting shit."
Patrick Palermo confronted the new arrivals. As Frank Palermo turned, Frank Taylor struck him, the co-defendant, with the club, hitting him in the forearm area. Frank Palermo proceeded toward Frank Taylor, angrily cursing him. However, Frank Taylor, now joined by Briggs, approached the co-defendant.
*1161 The co-defendant backed away and tripped. He lay on the ground and moved away from the alleged victims in a crablike walk. Frank Taylor walked toward the co-defendant, swinging the club while Briggs tried to kick the co-defendant. Frank Palermo was struck several times in the leg with the club. He was also struck on the head and shoulder.
Finally, the co-defendant grabbed the club and threw it into the field. Briggs and Frank Taylor backed away and Frank Palermo ran toward his vehicle. The co-defendant saw one of the new arrivals going toward his brother with a baseball bat. Frank Palermo assisted his brother. Defendant, who now had possession of the baseball bat, wanted to continue fighting. However, the co-defendant cautioned his brother that there were too many to fight and informed him the brothers should leave.
The two new arrivals left and the brothers began walking toward their (the brothers') vehicle. Briggs approached and scuffled with the co-defendant. Patrick Palermo separated the two men. Briggs ran. Frank Palermo asked his brother for the baseball bat and said to the alleged victims, "All right. You all want this shit? ... If this is what you want, `F' it, this is what's going to happen." Frank Taylor yelled in response,
"You white ass [M-F]. You got your ass kicked. How you feel now? What do you think about it now? You stick your finger now, this is what's going to happen."
Patrick Palermo grabbed the co-defendant and said, "Come on. Don't worry about it we've got to go." Defendant did not want to be involved with the police. The brothers decided to leave.
As the co-defendant walked toward his vehicle and reached for the door handle, he was doused with gasoline. Although Frank Palermo did not see the person responsible, he was certain it was Frank Taylor. Frank Taylor, however, denied pouring gasoline on the co-defendant.
Frank Palermo testified Frank Taylor taunted and cursed him with racial slurs. Out of anger, Frank Palermo, baseball bat in hand, went after Frank Taylor. The codefendant struck windows of the stalled car. The co-defendant admitted yelling, "You little [F-ing] niggers. You little bastard."
Frank Taylor denied using racial slurs. He also stated he did not know of any foul language used by Briggs.
Frank Palermo's back began to burn. He removed his shirt and proceeded toward the brothers' vehicle. Noticing the gasoline can, the co-defendant retrieved the can, and said, "You want to throw gas?" Next, the co-defendant chased Frank Taylor while throwing gasoline at Frank Taylor. Frank Palermo denied pouring gasoline on the cars, but admitted gasoline was unintentionally spilled on the cars because Frank Taylor dodged the co-defendant between the vehicles.
Briggs and the mechanic tackled the co-defendant and Frank Palermo fell to the ground. Patrick Palermo intervened, separating the men. The brothers left the scene.
The co-defendant admitted yelling, "nigger" and stated that he may have said, "pussy ass niggers." Frank Palermo denied ever seeing or hearing a small child at the scene.
Defendant did not testify.
Deputy Devon Rogers, Deputy Laurie Toreto, and Sergeant Sean Lusk responded to the call. Deputies Rogers and Toreto pursued the brothers as they fled the scene. The brothers were apprehended and returned to the scene where they were identified by the alleged victims. Firemen also arrived to hose the gasoline-covered vehicles.
Deputy Rogers testified he did not notice any injury to the co-defendant, whose shirt was off at the time of the arrest. The co-defendant did not request medical treatment, nor did he inform the officer he was attacked. Sergeant Diane Robinson, *1162 a desk sergeant, testified that the codefendant's health screening form taken on September 9, 1998, indicated Frank Palermo replied "No" when questioned as to whether he had any injuries.

ASSIGNMENTS OF ERRORS NUMBERS ONE, TWO, THREE, FOUR, FIVE AND TEN
The two companion cases[6] present issues of first impression. Defendant raises on appeal the constitutionality of LSA-R.S. 14:54, primarily based on the assertion the statute charges a non-crime, giving the trial judge the authority to determine the charged offense. LSA-R.S. 14:54 provides:
The placing of any combustible or explosive material in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to such structure, watercraft, movable, or forestland, shall constitute an attempt to commit arson within the meaning of the attempt article of this Code, and the court shall look at Articles 51 through 53 of this Code in order to determine which type of arson was attempted [emphasis added].
The seminal issue is whether the emphasized provision is merely a sentencing guideline, establishing the minimum to the maximum sentences, or whether the provision allows the trial judge to charge defendant with a crime after hearing the evidence.
Defendant challenges the validity of LSA-R.S. 14:54, alleging the offense is only an alternative definition of attempt. He also asserts the trial judge determined the underlying offense at sentencing and usurped the jury's function, thereby constituting reversible error; the jury charges did not advise the jury of the elements of the offense; and the sentence imposed is invalid because it is based upon an invalid statute and an erroneous/undefined penalty range.
Regarding the constitutional attack of LSA-R.S. 14:54, defendant argues the following: (1) LSA-R.S. 14:54 impermissibly removes from the trier of fact the determination of which form of arson was attempted; (2) the statute does not inform defendant of the nature and cause of the crime charged; and, (3) the statute is unconstitutionally vague and ambiguous since it does not apprise defendant of a definite penalty.
Defendant also argues that if this court upholds the statute, then, under State v. Piazza[7], he is entitled to the minimum sentence available under the statute, which would be no fine and no imprisonment. The State[8] argues the statute is presumed constitutional and defendant did not meet his burden of proving it was unconstitutional.
Defendant filed a motion in arrest of judgment alleging, inter alia, the bill of information was defective on the basis LSA-R.S. 14:54 was not a valid statute. He argued below that the statute was unconstitutionally vague and ambiguous since it did not provide a sentencing range. The trial judge denied the motion.

CONSTITUTIONAL PRECEPTS
Constitutional scrutiny favors the statutes, which are presumed to be valid, and the constitutionality of a statute should be upheld whenever possible. Because a statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality. State v. Griffin, 495 So.2d 1306, 1308 (La. 1986).
In State v. David, 468 So.2d 1126, 1128 (La.1984), cert denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1985), the court articulated two statutory due process requirements: "(1) adequate notice to individuals *1163 that certain contemplated conduct is proscribed; and (2) adequate standards for those charged with determining the guilt or innocence of an accused."
In State v. Union Tank Car Co., 439 So.2d 377, 384-385 (La.1983), the Louisiana Supreme Court explained just what these two requirements entail:
In connection with the requirement of adequate notice, this court has held that a penal statute must describe unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto. State v. Baron, 416 So.2d 537 (La.1982); State v. Dousay, 378 So.2d 414 (La.1979); State v. Payton, 361 So.2d 866 (La.1978). Likewise, the requirement of adequate standards for ascertaining guilt mandates that a criminal statute mark boundaries "sufficiently distinct for judges and juries to administer the law in accordance with the legislative will." City of Baton Rouge v. Norman, 290 So.2d 865, 868 (La.1974). As explained by this Court in the case of State v. Dousay, 378 So.2d 414, 417 (La. 1979):
The constitutional requirement of definiteness is satisfied when the language of a criminal enactment `has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden', State v. Defrances, 351 So.2d 133, 135 (La.1977), or when `the crucial words [or] phrases in the criminal statute have a fixed and definite meaning for the person of ordinary intelligence.' State v. Cloud, 248 La. 125, 130, 176 So.2d 620, 622 (1965)[.]
The criminal code itself requires that penal statutes must be strictly construed and cannot be extended to cases not included within the clear import of their language, and that nothing is a crime which is not clearly and unmistakably made a crime. La.R.S. 14:3, 14:7, State v. Truby, 211 La. 178, 29 So.2d 758 (1947)[.]

DOES LSA-R.S. 14:54 SET FORTH A PUNISHABLE OFFENSE, OR DOES IT MERELY DEFINE AN ATTEMPT UNDER LSA-R.S. 14:27?
Defendant argues the statute does not charge an offense, but functions only as an attempt. He also argues the bill does not charge LSA-R.S. 14:51 through 53, and that a charge of 14:54 alone is an invalid charge. He refers to the comment to the statute, and to pattern jury instructions, which refer to the charge as an attempt. However, comments do not constitute parts of the law. LSA-C.Cr.P. art. 10. See also State v. Lampkin, 253 La. 337, 218 So.2d 289, 296 (1969) (wherein the court held that comments may be persuasive, but they are not binding upon the court, and the rationale expressed in the particular comment at issue in that case was unsound and even contrary to a pronouncement by the United States Supreme Court).
The State argues the crime of placing combustibles is an offense and not merely an attempt, citing LSA-R.S. 14:107.2A and 40:1563.1, which refer to the crime as an offense.
State v. Eames, 365 So.2d 1361, 1363 (La.1978) explained:
An attempt is an inchoate offense. The crime of attempt is designed to punish certain activity which was not completed incipient criminal activity. It depends for its existence on a "specific intent to commit a crime." R.S. 14:27. If the definition of another crime includes the attempt to do something, the attempt statute, R.S. 14:27, cannot be employed, for then a defendant would be charged with an attempt to attempt to do an illegal act.
When presented with the issue of whether obscenity was in the nature of an attempt, the court in State v. Walters, 440 So.2d 115, 120-121 (La.1983), concluded otherwise, and elaborated:
Obscenity under Section 106A(1) is not an inchoate offense, since it requires *1164 the act of "exposure." Thus, defendants' argument that there can be no attempt to commit this offense, because the completed offense is itself in the nature of an attempt, has no merit.
Similarly, LSA-R.S. 14:54 is not an inchoate offense because it requires the act of "placing of any combustible or explosive material in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to such structure, watercraft, movable, or forestland[.]"
Legislative history reveals the following. Originally, R.S. 1870, §§ 845, 846, provided for two similar punishable offenses, as follows:
Sec. 845. Whoever shall attempt wilfully and maliciously to set fire to any house or building, or to set fire to any vessel, steamboat or other water-craft, shall, on conviction, be imprisoned at hard labor for not less than five nor more than ten years.
Sec. 846. Whoever shall be convicted of having maliciously prepared combustible materials and put them in any place with the intent to set fire to any house or building, or to a vessel, steamboat or other water-craft, the person thus convicted shall be sentenced to an imprisonment at hard labor for not less than five years nor more than fifteen years, although the said person had not yet set fire to the said combustible matters.
Section 846, the preparation and placing of combustible materials was the more severely punished offense.
Acts 1898, No. 153, § 1 amended and reenacted Section 846 as follows:
Section 846. Whoever shall maliciously prepare combustible matter or explosive substances and put them in any place with the intent to set fire or to blow up or destroy any house or building, or ship, vessel, steam boat or other watercraft, shall upon conviction, suffer imprisonment at hard labor for not less than five years nor more than fifteen years, although the said person had not yet set fire to the said combustible matter or explosive substance [emphasis added].
At that time, unlike the present, the penalty provision was incorporated within the provision setting forth the charged offense. As explained in State v. Helle, 137 La. 388, 68 So. 735, 736 (1915),
This section prescribes a punishment for whoever has prepared combustible matter or explosive substances, and has put them in any place with the intention to blow up or destroy that place, even though he has not set fire to the explosive or combustible.
To constitute the offense one must put the explosive in the place to be destroyed, or, at least in a place near by[.]
Thus, the earlier provision, which did not include movables or any structure as included at present, made the offense, as defined in that section, (short of actually setting fire), a punishable offense. It is apparent the legislature considered the act of placing the combustible or explosive material with the intent to set fire as described in the statute, to constitute a punishable offense.
Acts 1928, No. 211, §§ 5, 6 were part of comprehensive legislation, which enacted laws relative to crimes of burning or attempting to burn certain property, and repealed inconsistent former laws. Those sections provided:
Section 5. That any person who wilfully or maliciously attempts to set fire to or attempts to burn or to aid, counsel or procures the burning of any of the buildings or property mentioned in the foregoing sections, or who commits any act preliminary thereto or in furtherance thereof, shall upon conviction thereof be imprisoned at hard labor for not less than one nor more than two years or fined not to exceed one thousand dollars.
Section 6. That the placing or distributing of any inflammable, explosive or combustible material or substance, or any device, in any building or property mentioned in the foregoing sections in *1165 an arrangement or preparation with intent to eventually wilfully or maliciously set fire to or burn same, or to procure the setting fire to or burning of same, shall, for the purposes of this act, constitute an attempt to burn such building or property.
Thus, in 1928, the placing of combustibles was changed from a separately punishable offense, to a definition of attempt. However, the law still maintained a similar punishable offense as set forth in Section 5.
Acts 1932, No. 186, § 2 amended and reenacted Section 6 of Act No. 211 of 1928 as follows:
Section 6. That the placing, distributing or igniting of any inflammable, explosive or combustible material or substance, or any device, in, under, on, or near any building or property mentioned in the foregoing sections in arrangement or preparation with intent to eventually wilfully or maliciously set fire to or burn same, or to procure the setting fire to or burning of same, shall, for the purpose of this act, constitute an attempt to burn such building or property. [emphasis added].
The Louisiana Criminal Code was adopted by the legislature as Act 43 of 1942. Acts 1942, No. 43, § 1, Art. 54 again provided that the placing of combustible materials constituted and defined an attempt, instead of setting forth a punishable offense, as follows:
Art. 54. The placing of any combustible or explosive material in or near any structure, water craft, or movable, with the specific intent eventually to set fire to such structure, water craft, or movable, shall constitute an attempt to commit arson.
The comments to the article provided in part that:
This article is intended to make clear that any placing of materials with the intent to set fire to them, shall constitute an attempt to commit arson.
Acts 1944, No. 111, § 1, amended and reenacted Article 54 and provided penalties, again providing for a punishable offense as follows:
Article 54. The placing of any combustible or explosive material in or near any structure, water-craft, or movable, with the specific intent eventually to set fire to such structure, water-craft or movable, shall constitute a misdemeanor and upon conviction thereof such offender shall be fined not over Two Thousand Dollars ($2,000), or imprisoned for not more than five (5) years, or both.
In 1946, the legislature amended and reenacted Article 54 and that provision is similar to the current provision. Acts 1946, No. 305, § 1 provided:
The placing of any combustible or explosive material in or near any structure, water craft, or movable, with the specific intent eventually to set fire to such structure, water craft, or movable, shall constitute an attempt to commit arson within the meaning of the Attempt Article (Article 27) of this Code, and the court shall look to Articles 51 through 53 of this Code in order to determine which type of Arson was attempted [emphasis added].
The 1946 amendment to Acts 1944, No. 111, § 1 amended the penalty portion of the article.
The latest amendment and reenactment of Article 54 occurred by Acts 1970, No. 660, § 1. The amendment added "forestland." LSA-R.S. 14:54. Section 2 of the act provided:
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items or applications, and to this end the provisions of this Act are hereby deemed severable.
Also in the same year, the legislature gave authority to the fire marshal, the first assistant fire marshal, each deputy fire marshal and state or municipal arson investigator, *1166 while engaged in the performance of their duties as such, to arrest individuals suspected of having violated certain criminal laws, including LSA-R.S. 14:51, 52, 53, and 54. LSA-R.S. 40:1562.1 (Acts 1970, No. 539, § 1). The act also gave authority to arrest for any other criminal laws making unlawful an attempt or conspiracy to commit these offenses. Section 2 of the act additionally provided a severability clause as did LSA-R.S. 14:54. Although amended in 1997, the statute still provides arresting authority for 14:54. Acts 1997, No. 973, § 1 (now LSA-R.S. 40:1563.1A(4) and (16)).
Thus, the legislative intent in 1970 was that 14:54 was a punishable offense. This intent was also made clear in 1997 when the legislature added LSA-R.S. 14:107.2, the Hate Crimes statute, Acts 1997, No. 1479, § 2, as follows (in pertinent part):
A. It shall be unlawful for any person to select the victim of the following offenses against person and property because of actual or perceived race, age, gender, religion, color, creed, disability, sexual orientation, national origin, or ancestry of that person or the owner or occupant of that property or because of actual or perceived membership or service in, or employment with, an organization: [s]imple or aggravated arson; placing combustible materials [.]
B. If the underlying offense named in Subsection A of this Section is a misdemeanor, and the victim of the offense listed in Subsection A of this Section is selected in the manner proscribed by that Subsection, the offender may be fined not more than five hundred dollars or imprisoned for not more than six months, or both. This sentence shall run consecutively to the sentence for the underlying offense.
C. If the underlying offense named in Subsection A of this Section is a felony, and the victim of the offense listed in Subsection A of this Section is selected in the manner proscribed by that Subsection, the offender may be fined not more than five thousand dollars or imprisoned with or without hard labor for not more than five years, or both. This sentence shall run consecutively to the sentence for the underlying offense[.] [emphasis added].
The legislature determined that 14:54 was an underlying offense for the purposes of the Hate Crimes statute.
LSA-R.S. 14:54 does not express a penalty provision, but refers to LSA-R.S. 14:51 through 53 and 14:27, the attempt statute. In State v. Piazza, 596 So.2d 817, 819-820 (La.1992), the court considered a conflict in the penalty portion of a statute, and held that when two or more interpretations of the penalties are possible, lenity directs the court to impose the least severe penalty. We find no conflicting penalty provisions in the sentencing portion of LSA-R.S. 14:54, and disagree with defendant that Piazza's rule of lenity requires this court to apply the least severe penalty.
However, the Piazza court also enunciated principles of statutory construction, which we find applicable. In Piazza, the court explained that a court should give harmonious effect to all acts on a subject when reasonably possible because the legislature presumably intends to achieve a consistent body of law and theoretically it envisions the entire body of law when it enacts new legislation. The determinative question is whether the statutes can be reconciled with legislative intent. 596 So.2d at 819-820 (and cases cited therein).
LSA-R.S. 14:54 provides in pertinent part that the offense "shall constitute an attempt to commit arson within the meaning of the attempt article of this Code, and the court shall look at Articles 51 through 53 of this Code in order to determine which type of arson was attempted." Thus, the statute refers to LSA-R.S. 14:27, and 14:51 through 53. Having determined the legislative intent is that LSA-R.S. 14:54 is a punishable offense, we now determine, in light of Piazza, whether LSA-R.S. 14:54 can be reconciled with 14:51 through 14:53 and the attempt statute, 14:27.
*1167 Defendant argues that he was not given notice of the charges against him based on the statute's reference to LSA-R.S. 14:51 through 53, since the bill of information did not charge him with LSA-R.S. 14:51 through 53. The trial judge, in denying the motion, did not interpret the statute in that fashion. Instead, he considered the later portion of the statute as a legislative sentencing directive. We agree.
A sentencing directive is within the province of the trial judge, and not the jury. LSA-C.Cr.P. art. 871; State v. Lacoste, 256 La. 697, 237 So.2d 871, 874 (1970). Furthermore, the legislature has enunciated and recognized sentencing guidelines, which include the seriousness of the offense is a factor. See, LSA-C.Cr.P. art. 894.1A(3).
After considering the legislative history of LSA-R.S. 14:54, and the constitutional precepts, including the Piazza analysis, we conclude that LSA-R.S. 14:52 through 53 and 14:27 can be reconciled with 14:54. We hold that 14:54 provides a sentencing directive to the trial judge whereby the trial judge must consider LSA-R.S. 14:51 through 53, and 14:27 in determining the sentencing range. Thus, LSA-R.S.14:54 is facially valid since it charges a crime and not an inchoate offense.
Considering LSA-R.S. 14:51, 52, 52.1, 53, and 14:27D(3)[9] as required by 14:54, defendant's sentencing exposure for imprisonment ranged from no mandatory minimum, to be served with or without hard labor, and no statutory restriction that the sentence be served in part without benefit of parole, probation, or suspension of sentence (14:27D(3) and 14:52C, simple arson), to a maximum of ten years at hard labor (14:27D(3) and 14:51, aggravated arson), with one year of the sentence to be served without benefit of parole, probation, or suspension of sentence (14:27D(3), 14:51, aggravated arson and 14:52.1 simple arson of a religious building). In addition, a fine of no more than twelve thousand, five hundred dollars, ($12,500.00), could be imposed (14:27D(3) and 14:51)).
We are mindful of the recent United States Supreme Court case, Apprendi, v. New Jersey, ___ U.S. ___, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000), wherein the court declared a New Jersey statutory scheme for a Hate Crime unconstitutional. That scheme, unlike the Louisiana statute, allowed a court to impose a sentence exceeding the statutory maximum for the crime of conviction when the court found by a preponderance of the evidence that defendant was motivated by a statutorily-defined bias, which included race. A five-four court concluded that any fact which increases the punishment for a crime above the statutory maximum, absent the fact of a prior conviction, is subject to the jury's determination of proof beyond a reasonable doubt. ___ U.S. ___, 120 S.Ct. 2348, 2357-58, 147 L.Ed.2d 435.
Apprendi is distinguishable since in that case the court found that defendant was exposed to a greater punishment on the basis of a judicial finding rather than the original jury verdict. ___ U.S. ___, 120 S.Ct. 2348, 2357-58, 147 L.Ed.2d 435. In this case, however, defendant was not exposed to a greater punishment on the basis of the judicial finding rather than the jury's verdict. The sentencing range for placing combustibles did not increase after conviction. The trial judge's finding was permissible sentencing discretion in taking into consideration various factors relating to the offense and the offender and in imposing a judgment within the range prescribed by statute.
___ U.S. ___, 120 S.Ct. 2348, 2357-60, 147 L.Ed.2d 435.[10]
*1168 Having concluded the statute validly charges an offense, we necessarily find no merit to defendant's error regarding the failure of the trial judge to instruct the jury as to the elements of arson, a crime for which defendant was not charged, even assuming defendant properly preserved the error in the absence of a contemporaneous objection.[11]

ASSIGNMENT OF ERROR NUMBER SIX: APPLICABILITY OF ALLEN V. UNITED STATES[12]
Initially, the foreman informed the court the jury reached a verdict of "not guilty" as to all counts. The jury was polled twice because the members misunderstood the trial judge's instructions regarding the recordation of "yes" or "no" votes to the three counts. After the second poll, it became clear the verdict was illegal with six "yes" and six "no" votes. The trial judge expressed concern that his instructions were unclear. The foreman explained that although he voted defendant guilty on count one, he wrote "no" when polled, based on his finding defendant was not guilty on the other counts. He explained that this could be the reason the court had so many "no" votes.
The trial judge further attempted to clarify the voting and asked the foreman whether ten jurors agreed defendant was not guilty of placing combustibles. The foreman responded the vote was seven to five in favor of guilty on count one. The trial judge explained in order to have a verdict, ten jurors must agree, "either way."[13] The foreman replied the members had ample time, stating that the jury would return to deliberate.
Afterwards, the trial judge gave the following instruction:
[A]ny vote in this case has to be ten/ two, either way. In order to reach a verdict in this case, the vote has to be ten/two. Then [sic] of you must concur to reach a verdict. If ten of you cannot concur in reaching a verdict, then that's a different story. But it takes ten to two, either way, in order for a verdict to be reached. Do you all understand that? Okay. Why don't you go back.
Defendant argues the trial judge erred in charging the jury with a prohibited "Allen" charge after the jury was deadlocked. Initially, we note defendant did not raise a contemporaneous objection below on this ground. Instead, defendant objected to, and sought a mistrial for, the *1169 alleged ground that the jury was tainted by observing spectators' reactions to the initial verdict. The trial judge, upon defense counsel's request, admonished the jury members not to be swayed by any type of reaction and to decide the case only on the law and the evidence.
Even assuming the issue raised for the first time on appeal is properly before this court, we find no merit to this assignment since we conclude the jury was not deadlocked, nor was there a prohibited "Allen" charge.
As explained in State v. Caston, 561 So.2d 941, 942 (La.App. 2 Cir.1990),
The Allen charge stems from the United States Supreme Court decision in Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). In that case, the court approved of a charge designed to break jury deadlocks and achieve jury unanimity. The predominant thrust of the original Allen charge was that the minority block of the jury, regardless of whether they were for conviction or acquittal, should reconsider the reasonableness of their opinion, as it was not shared by a majority of the jury.
In State v. Nicholson, 315 So.2d 639, 641-642 (La.1975), the court held that the tenor of the instructions in that case presented a substantial risk that "a juror or jurors possessed of a genuine conviction that reasonable doubt exists would thereby be coerced into agreement with a majority voting to render a guilty verdict."
Defendant characterizes the failure of the jury to reach a valid verdict as a deadlock. Relying on the minutes, defendant argues that the jury reached a final verdict in such a short period of time, suggesting the jury members surrendered their beliefs in order to achieve a verdict. However, the foreman stated the jury had ample time, indicating there was no suggestion of pressure to achieve a valid verdict.
The instruction given by the trial judge, viewed in the entire context of the jurors' misunderstanding regarding the method for recording the verdicts, was not coercive and did not rise to the Allen/Nicholson level. Further, since the foreman expressly stated the members had ample time and would deliberate, the jury, at this point, was not deadlocked.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER NINE: SUFFICIENCY
Defendant complains the trial judge erred in denying his motion for acquittal on the basis there was insufficient evidence to prove defendant acted as a principal or that the elements for proving arson were met. We note at the outset that defendant was not charged with arson, and thus sufficiency, as it relates to a non-charged offense or offenses, is irrelevant.
The jury found defendant guilty, as a principal of placing combustible materials in violation of LSA-R.S. 14:54.
La. R.S.14:24 defines principals as:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
Moreover, "an individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state." State v. Pierre, 93-0893, p. 4, 631 So.2d 427, 428 (La.1994) (citing State v. Holmes, 388 So.2d 722, 726 (La. 1980)).
The State argues the evidence established that defendant aided and abetted his brother in committing the crime of placing combustibles. Defendant states that no one testified he had the gasoline can in his hands or that he actively assisted his brother in pouring gasoline.
The crime of placing combustible materials required the State to prove, in this case, the placing of any combustible or *1170 explosive material in or near any movable, with the specific intent eventually to set fire to such movable. It is undisputed that defendant did not directly place the gasoline on the cars, nor did he attempt to set fire to them. The issue is whether he aided and abetted in its commission, or directly or indirectly counseled or procured his brother to commit the crime. LSA-R.S. 14:24 and 14:54.
In reviewing claims challenging the sufficiency of the evidence, this court must consider "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). See also LSA-C.Cr.P. art. 821(B); State v. Mussall, 523 So.2d 1305, 1308, 1309 (La.1988).
A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. State v. Silman, 95-0154, p. 12 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the Jackson standard of review. State v. Bordenave, 95-2328, p. 2 (La.4/26/96), 678 So.2d 19, 20 (quoting Jackson, 443 U.S. at 319, 99 S.Ct. at 2789 (emphasis in original)). It is not the function of an appellate court to assess credibility or reweigh the evidence. Appellate review for minimal constitutional sufficiency of evidence is a limited one restricted by the standard developed in Jackson. State v. Rosiere, 488 So.2d 965, 968 (La. 1986) (and the cases cited therein).
LSA-R.S. 15:438 provides that when evidence is circumstantial, the applicable rule is that, "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." In Rosiere, 488 So.2d at 965, 968, the Louisiana Supreme Court explained:
This is not a purely separate test from the Jackson sufficiency standard to be applied instead of a sufficiency of the evidence test whenever circumstantial evidence forms the basis of the conviction. Ultimately, all evidence, both direct and circumstantial, must be sufficient under Jackson to satisfy a rational juror that the defendant is guilty beyond a reasonable doubt. Due process requires no greater burden.
Defendant asserts the evidence does not exclude the reasonable hypothesis that he did not willingly participate in his brother's decision to pour gasoline on the cars and to attempt to set them on fire. Thus, defendant concludes that circumstantial evidence formed the basis for the conviction. The record reveals otherwise.
There was direct evidence showing defendant directly counseled and encouraged his brother to place the gasoline in or near the cars, with the specific intent eventually to set fire to the vehicles. Frank Taylor testified that while Frank Palermo poured gasoline on the vehicles, Patrick Palermo was telling Frank Palermo, "Go ahead, set their cars on fire." Briggs testified that while Frank Palermo was trying to set two of the vehicles on fire, Patrick Palermo was holding the bat and cheering him on.
In contrast, Frank Palermo denied he was intentionally pouring gasoline on the cars.
The jury evidently attached greater weight to the testimony of Frank Taylor and Briggs. As stated in State v. Pascual, 98-1052, p. 6 (La.App. 5 Cir. 3/30/99), 735 So.2d 98, 101 (citation omitted):
It is the role of the fact finder to determine the weight of the evidence and the jury may accept or reject, in whole or in part, the testimony of any witness. The appellate courts may not second guess the jury's rational credibility determinations.
Thus, viewing all of the evidence both direct and circumstantial in the light most favorable to the state, it appears that any *1171 rational trier of fact could have concluded beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence that defendant aided and abetted in its commission, or directly or indirectly counseled or procured his brother to place the gasoline in or near the cars, with the specific intent eventually to set fire to such movable. LSA-R.S. 14:54.
Defendant also argues the trial judge erroneously denied his motion for acquittal on the basis defendant did not leave the area. Although the trial judge focused on the evidence that defendant, the driver of the vehicle, continued to return to the scene and did nothing to end the confrontation, he was addressing an argument raised by trial counsel that a majority of the time defendant was trying to leave the scene.
This assignment lacks merit.

ASSIGNMENT OF ERROR NUMBER SEVEN: HABITUAL OFFENDER PROCEEDING
Defendant argues the trial judge erred in failing to advise him of his right to remain silent prior to his admission of the underlying offense during the habitual offender colloquy. We agree. Further, there is no waiver of rights form indicating defendant was so informed by defense counsel. See LSA-R.S. 15:529.1D(1)(a) and (3); State v. Riggins, 97-1194, pp. 6-7 (La.App. 5 Cir. 8/25/98), 718 So.2d 569, 572, writ denied, 98-2520 (La.1/15/99), 736 So.2d 206.
Thus, we vacate defendant's habitual offender finding and sentence and remand the matter for rehearing and resentencing.
Although the issue raised in assignment of error number 8, regarding the trial court's failure to advise defendant of the prescriptive period for filing post-conviction relief, is moot, we nonetheless note that on remand the trial judge should properly inform defendant of the newlyshortened two-year prescriptive period provided in LSA-C.Cr.P. art. 930.8. See State v. Boles, 99-662, p. 7 (La.App. 5 Cir. 11/10/99), 750 So.2d 1059, 1062.
Accordingly, the conviction is affirmed; the multiple offender adjudication and sentence are vacated, and the matter is remanded for rehearing on the multiple bill, and resentencing.
CONVICTION AFFIRMED; MULTIPLE OFFENDER ADJUDICATION AND SENTENCE VACATED; CASE REMANDED FOR REHEARING AND RESENTENCING ON THE MULTIPLE BILL.
NOTES
[1] The bill of information was amended to refer to him as "Patrick Palermo" instead of "Anthony P. Palermo."
[2] See the companion case of State v. Frank Palermo, 99-1254 (La.App. 5 Cir. 7/25/00), 765 So.2d 1139, wherein some of the issues raised herein are similar or identical.
[3] Although the original sentence was vacated, and the issue is not raised on appeal, we note the vacated sentence was imposed with a two-year restriction, when only a one-year restriction was authorized. See LSA-R.S. 14:51 through 53, 14:54, and 14:27D(3). See also State v. Middlebrook, 409 So.2d 588, 592-593 (La.1982) and State v. Collins, 98-376, p. 11 (La.App. 5 Cir. 3/10/99), 734 So.2d 723, 728 (cases discussing the applicability of LSA-R.S. 14:27).
[4] The facts herein are identical to those in the companion case.
[5] The bill of information refers to him as "Kelly Cornell."
[6] See note 2, infra.
[7] 596 So.2d 817 (La.1992).
[8] The State Attorney General was afforded the opportunity to address the challenges to LSA-R.S. 14:54 and 107.2. On May 5, 2000, that agency responded it would adopt the state's arguments.
[9] The attempt statute provides:

(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.
[10] We also find Castillo v. United States, ___ U.S. ___, 120 S.Ct. 2090, 2091, 2092, 2096, 147 L.Ed.2d 94 (2000) inapposite. In Castillo, the court considered a federal criminal statute prohibiting the use or carrying of a firearm in relation to a crime of violence. The statute provided for an enhanced penalty upon a finding by the trial judge that the weapon used was a "machinegun." The court considered whether "Congress intended the statutory references to particular firearm types ... to define a separate crime or simply to authorize an enhanced penalty." After considering, inter alia, principles of lenity and statutory construction, the court concluded that Congress intended the finding of a particular type of firearm to refer to an element of a separate, aggravated crime and not to a sentencing factor or directive.
[11] Although not assigned as error and not raised below, defendant notes in brief that the failure to state the amount of damages in the bill may have impacted the size of the jury since LSA-R.S. 14:52C (simple arson where the damage is less than five hundred dollars) is a relative felony, requiring a six-person as opposed to a twelve-person jury. Defendant does not claim prejudice from being afforded greater protection than the law allegedly requires in this case. Cases in which the punishment may be confinement at hard labor shall be tried by a jury composed of six jurors, all of whom must concur to render a verdict. LSA-C.Cr.P. art. 782; State v. Williams, 99-223, p. 5 (La.App. 5 Cir. 6/30/99), 742 So.2d 604, 606-607. However, in the instant case, defendant's maximum sentence was ten years at hard labor. Therefore, the use of a twelve-person jury was proper since defendant was subject to punishment which was necessarily at hard labor, requiring a twelve-person jury. Article 782A. A case in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons. State v. Issac, 527 So.2d 1045, 1050 (La.App. 5 Cir.1988), writ denied, 532 So.2d 175 (La. 1988).
[12] 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed.2d 528 (1896).
[13] LSA-C.Cr.P. art. 782A.