765 So.2d 1139 (2000)
STATE of Louisiana
v.
Frank PALERMO.
No. 99-KA-1254.
Court of Appeal of Louisiana, Fifth Circuit.
July 25, 2000.
*1142 Paul D. Connick, Jr., District Attorney, Terry M. Boudreaux, Alison Wallis, Richard Bates, Joe Roberts, Assistant District Attorneys, Courthouse Annex, 5 th Floor, Gretna, Louisiana, Honorable Richard P. Ieyoub, Attorney General, Louisiana Department of Justice, Baton Rouge, Louisiana, Counsel for the State of Louisiana.
Bruce Netterville, Gretna, Louisiana, Counsel for appellant.
Court composed of Judges EDWARD A. DUFRESNE, Jr., CLARENCE E. McMANUS and THOMAS C. WICKER, Jr. Judge Pro Tempore.
McMANUS, Judge.
This appeal arises from the convictions and sentences of Frank G. Palermo[1] (Frank Palermo), for two counts of Hate Crimes, because of race, and one count of placing combustible materials. LSA-R.S. 14:107.2A and LSA-R.S. 14:54, respectively. The three-count bill of information charged defendant and co-defendant, Patrick Palermo.[2] Defendant entered a plea of not guilty. Frank Palermo adopted the co-defendant's motion to quash the Hate Crimes offenses, and the motion was denied. His motion to suppress statements was partially denied. Defendants were jointly tried before a jury, but the cases were not consolidated. Defendant's posttrial motions, which included a motion to quash sentencing, were denied by the trial judge. The trial judge sentenced defendant to ten years at hard labor for the offense of placing combustible materials; five years each at hard labor on the two Hate Crimes offenses, the sentencing on counts two and three (the Hate Crimes convictions) to run consecutively, with two years of the sentence being without the benefit of probation, parole, or suspension of sentence.[3] The trial judge denied defendant's motion to reconsider sentence. Thereafter, defendant filed a written motion for appeal. He assigns errors which raise the following issues: (1) LSA-R.S. 14:54 is unconstitutional; (2) the trial court's limitation of voir dire and the lack of a sufficient voir dire were prejudicial and violative of his constitutional rights; (3) defendant was denied his due process right to a complete transcript; (4) prosecution under the Hate Crimes statute should be quashed; (5) the trial court erred in denying his motion to suppress statements; (6) the sentences imposed were constitutionally excessive; and (7) cumulative errors require reversal.
The seminal issue before this court is res nova: does LSA-R.S. 14:54 charge a non-crime? Stated differently, is defendant's conviction of LSA-R.S. 14:54 a conviction stemming from a non-chargeable offense? LSA-R.S. 14:54 is the underlying offense for the Hate Crimes convictions. LSA-R.S. 14:107.2 A, B, and C. If LSA-R.S. 14:54 charges a non-crime, then there would be no underlying offense required for charging defendant under the Hate Crimes statute. We first address the fundamental basis of the convictions questioned by defendant. Principles of statutory construction and constitutional law convince us the statute does charge a crime, and the trial judge correctly denied the motions to quash. We also conclude that defendant's remaining arguments lack merit and we affirm the convictions. However, we find sentencing errors patent requiring that the sentences be vacated and the case be remanded for resentencing.

*1143 FACTS[4]
On September 9, 1998 defendant and codefendant (brothers/white males), allegedly initiated racially inspired altercations against Curtis Briggs (Briggs), and Frank Taylor, the African-American victims. The incidents between the brothers and the victims escalated, culminating in defendant's allegedly pouring gasoline on the victims' vehicles with the intent to set the automobiles on fire, while one of the vehicles was occupied by Briggs' son, Carnell Kelly (Kelly),[5] who was nearly three years of age.
The two alleged victims and the child traveled in Tony Taylor's Honda Accord to the Westbank of Jefferson Parish in order to purchase an automobile for Briggs. After the sale, Briggs' newly-purchased 1983 Cutlass Supreme broke down on the Westbank Expressway. Briggs went to get gasoline and encountered Tony Taylor, a mechanic, who arrived later at the scene to render assistance.
The Briggs-Frank Taylor version of the facts was presented by the victims, and Tony Taylor, as follows.
According to Frank Taylor, while Briggs was gone, another vehicle, driven by Patrick Palermo, in which defendant was a passenger, stopped. Defendant pointed his middle finger in the victim's direction, cursing the victim and calling the victim "nigger." Defendant further addressed the victim as "bitch-made nigger." The victim responded by pointing his middle finger toward defendant. After the gesture, defendant unsuccessfully tried to exit the vehicle, but he was impeded by the flow of traffic. Defendant instructed his brother to drive around the corner, and return in order to "get" the victims. When the Palermo brothers returned, Briggs was present.
The brothers were angry and wanted to fight. Briggs and Frank Taylor testified the Palermo brothers exited the vehicle, cursed the victims with racial slurs, and initiated an unprovoked attack. Frank Taylor testified defendant, upon exiting the vehicle, came toward him (Frank Taylor) remarking,
"Who are you pointing your finger at now, nigger? ... You want to fight now? Let's do this right here and right now ... Let's fight right now, nigger[.]"
The co-defendant chased Frank Taylor, urging Frank Taylor to fight. Meanwhile, defendant approached Briggs and asked,
"What you looking at, nigger? You want to fight? You want some of me now? You want to do something, because you ain't nothing. You ain't nothing but a little nigger and you ain't going to do nothing to me."
Frank Taylor stated he did not want to fight.
Briggs testified similarly. He stated defendant used racial slurs, referring to the victims as "black bastards" or "nigger." Briggs told the Palermo brothers he (Briggs) did not want any trouble. Defendant responded by following Briggs as Briggs walked away.
Defendant said,
"No. Don't run now. Talk that shit now. What you want to do now, punk mother fucker? You punk bitch. Huh, nigger, what you going to do now?"
Briggs then waved at passing traffic for assistance. Two African-American males responded.
Briggs testified one of these men grabbed a baseball bat from their vehicle. Defendant ran toward the two new arrivals and a fight began. However, the victims were not involved in the altercation. After the brief altercation, defendant gained possession of the baseball bat. The two new arrivals jumped into their vehicle and fled the scene. Upon leaving, defendant broke the taillight of their vehicle. The co-defendant, fearful of police intervention, urged *1144 his brother to leave. The brothers left the scene.
Frank Taylor testified that once the new arrivals left, defendant approached the victims, swinging a baseball bat. Defendant tried to break the window on Briggs' car and Briggs tried to stop defendant. Defendant pushed Briggs to the ground. Frank Taylor went to Briggs' aid and prevented defendant from swinging the baseball bat.
Prior to the next incident, Tony Taylor was at the scene, working on the disabled vehicle.
According to Briggs, when the brothers returned, defendant exited the vehicle cursing Briggs, saying, "You niggersÔÇöyou niggers are going to pay. Somebody's going to pay today. [F] that shit." The codefendant said nothing. Briggs denied using foul language or racial slurs toward the Palermos.
Defendant gave his brother the baseball bat while he, defendant, approached the Cutlass, grabbed the adjacent gasoline can, and threatened the victims would burn. Defendant poured gasoline on the Cutlass, unsuccessfully attempting to set it on fire, by making several attempts at lighting his cigarette lighter. Briggs' son was seated in the Honda, next to the Cutlass. Defendant next approached the Honda. He looked into the occupied vehicle and asked, "Is someone inside of this?" Despite hearing the child's cries, defendant said, "Oh, well, fuck it." He then poured gasoline on the Honda, attempting unsuccessfully to set it on fire with the cigarette lighter. According to Frank Taylor, defendant was unsuccessful in igniting the vehicles because it was drizzling at the time. Frank Taylor and Briggs testified that while defendant poured gasoline on the vehicles, the co-defendant, who held a baseball bat, encouraged defendant to pour gasoline on the cars and to set them on fire.
Briggs and Tony Taylor testified it was evident the child was in the vehicle since the boy was yelling for his father. Briggs stated he tried to remove his son from the vehicle but was prevented from doing so by defendant, who pushed Briggs to the ground.
According to Briggs, after defendant failed to ignite the vehicles, defendant abandoned the gasoline can and retrieved the baseball bat from his brother. Defendant struck the Cutlass, breaking a window and a windshield. Defendant then discarded the broken bat in the Cutlass.
Frank Taylor and Tony Taylor testified that defendant also attempted pouring gasoline on the mechanic's car. The two brothers and the mechanic fought. Afterwards, the co-defendant expressed concern the police would arrive and prompted defendant to leave. Once again the brothers left.
Linda Pugh testified she alerted the police to the fighting incident after she drove near the scene and specifically observed the co-defendant splash gasoline on the vehicles.
The Palermo brothers' version was recounted by defendant, and that version differed in part as follows. Defendant thought the stalled car was similar to his neighbor's car. He wanted to provide assistance, but was unable to do so because of traffic. After his brother hit the horn, defendant pointed to Frank Taylor, using a mannerism defendant uses in greeting. In response, Frank Taylor stuck his finger at defendant. Defendant was unconcerned and attributed Frank Taylor's gesture as mere irritation at having broken down. Defendant instructed his brother to drive around the block and return.
Upon their return, defendant approached the mechanic, offering suggestions. There, the alleged victims approached defendant. Frank Taylor carried a club which is used to lock a steering wheel. Frank Taylor cursed and asked defendant why defendant stuck his finger at Frank Taylor. Defendant denied doing so. When defendant explained to Frank Taylor he thought he recognized the car, Frank *1145 Taylor responded, "No. That's bullshit. You stuck the finger at us." Frank Taylor made such statements as, "What your white ass wants." Defendant's brother responded by saying something like, "F you, niggers."
Defendant explained that he and his brother use the "N" word daily in reference to each other and that the word does not have a racial connotation for the brothers. Frank Taylor became agitated and wanted to fight. At this point, two men arrived, inquiring about the problem. Frank Taylor responded, "These white M-F's they want to fight. They're giving us trouble. They're starting shit."
Defendant's brother confronted the new arrivals. As defendant turned, Frank Taylor struck defendant with the club, hitting him in the forearm area. Defendant proceeded toward Frank Taylor, angrily cursing him. However, Frank Taylor, now joined by Briggs, approached defendant.
Defendant backed away and tripped. He lay on the ground and moved away from the alleged victims in a crab-like walk. Frank Taylor walked toward defendant, swinging the club while Briggs tried to kick defendant. Defendant was struck several times in the leg with the club. He was also struck on the head and shoulder.
Finally, defendant grabbed the club and threw it into the field. Briggs and Frank Taylor backed away and defendant ran toward his vehicle. Defendant saw one of the new arrivals going toward defendant's brother with a baseball bat. Defendant assisted his brother. Defendant's brother, who now had possession of the baseball bat, wanted to continue fighting. However, defendant cautioned his brother that there were too many to fight and informed him the brothers should leave.
The two new arrivals left and the brothers began walking toward their (the brothers') vehicle. Briggs approached and scuffled with defendant. Defendant's brother separated the two men. Briggs ran. Defendant asked his brother for the baseball bat and said to the alleged victims, "All right. You all want this shit? ... If this is what you want, `F' it, this is what's going to happen." Frank Taylor yelled in response,
"You white ass [M-F]. You got your ass kicked. How you feel now? What do you think about it now? You stick your finger now, this is what's going to happen."
Defendant's brother grabbed defendant and said, "Come on. Don't worry about it we've got to go." Patrick Palermo did not want to be involved with the police. The brothers decided to leave.
As defendant walked toward his vehicle and reached for the door handle, he was doused with gasoline. Although defendant did not see the person responsible, he was certain it was Frank Taylor. Frank Taylor, however, denied pouring gasoline on defendant.
Frank Palermo testified Frank Taylor taunted and cursed him with racial slurs. Out of anger, Frank Palermo, baseball bat in hand, went after Frank Taylor. Defendant struck windows of the stalled car. He admitted yelling, "You little [F-ing] niggers. You little bastard."
Frank Taylor denied using racial slurs. He also stated he did not know of any foul language used by Briggs.
Defendant's back began to burn. He removed his shirt and proceeded toward the brothers' vehicle. Noticing the gasoline can, defendant retrieved the can, and said, "You want to throw gas?" Next, defendant chased Frank Taylor while throwing gasoline at Frank Taylor. Defendant denied pouring gasoline on the cars, but admitted gasoline was unintentionally spilled on the cars because Frank Taylor dodged defendant between the vehicles.
Briggs and the mechanic tackled defendant and defendant fell to the ground. *1146 Defendant's brother intervened, separating the men. The brothers left the scene.
Defendant admitted yelling, "nigger" and stated that he may have said, "pussy ass niggers." Defendant denied ever seeing or hearing a small child at the scene.
Defendant testified he was previously convicted of possession of marijuana, burglary, and theft.
Defendant's brother did not testify.
Deputy Devon Rogers, Deputy Laurie Toreto, and Sergeant Sean Lusk responded to the call. Deputies Rogers and Toreto pursued the brothers as they fled the scene. The brothers were apprehended and returned to the scene where they were identified by the alleged victims. Firemen also arrived to hose the gasoline-covered vehicles.
Deputy Rogers testified he did not notice any injury to defendant, whose shirt was off at the time of the arrest. Defendant did not request medical treatment, nor did he inform the officer he was attacked. Sergeant Diane Robinson, a desk sergeant, testified that defendant's health screening form taken on September 9, 1998 indicated defendant replied "No" when questioned as to whether he had any injuries.
According to Deputy Toreto, defendant, who was in the rear of Deputy Rogers' unit, kicked and beat the glass. Defendant yelled that she was a "nigger lover." He stated that "all the `N's' need to burn." In contrast, defendant denied making the racial comments. He testified he shook the car to get her attention because his handcuffs were too tight. Deputy Toreto did not recall these complaints.
Sergeant Lusk testified that while defendant was being handcuffed, he (defendant) repeatedly used racial epithet.

ASSIGNMENT OF ERROR NUMBER ONE: LSA-R.S. 14:54 IS UNCONSTITUTIONAL SINCE IT REMOVES FROM THE TRIER OF FACT EVIDENTIARY DETERMINATIONS, AND THE TRIAL COURT ERRED BY DENYING THE MOTIONS TO QUASH SENTENCING AND THE MOTION FOR NEW TRIAL; ASSIGNMENT OF ERROR NUMBER FOUR: THE TRIAL JUDGE ERRED BY DENYING DEFENDANT'S MOTION TO QUASH LSA-R.S. 14:107.2, THE HATE CRIMES STATUTE
LSA-R.S. 14:54
The two companion cases[6] present issues of first impression. Defendant raises on appeal the constitutionality of LSA-R.S. 14:54, primarily based on the assertion the statute charges a non-crime, giving the trial judge the authority to determine the charged offense. LSA-R.S. 14:54 provides:
The placing of any combustible or explosive material in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to such structure, watercraft, movable, or forestland, shall constitute an attempt to commit arson within the meaning of the attempt article of this Code, and the court shall look at Articles 51 through 53 of this Code in order to determine which type of arson was attempted [emphasis added].
The seminal issue is whether the emphasized provision is merely a sentencing guideline, establishing the minimum to the maximum sentences, or whether the provision allows the trial judge to charge defendant with a crime after hearing the evidence.
Defendant argues the following: (1) LSA-R.S. 14:54 impermissibly removes from the trier of fact the determination of which form of arson was attempted; (2) the statute does not inform defendant of the nature and cause of the crime charged, such notice being required by State v. Jones, 426 So.2d 1323, 1327 (La.1983); and (3) the statute is unconstitutionally vague and ambiguous since it does not apprise defendant of a definite penalty. Defendant also argues that if this Court upholds the statute, then, under State v. Piazza[7] *1147 he is entitled to the minimum sentence available under the statute, which would be no fine and no imprisonment.
The state[8] asserts defendant is precluded from raising the constitutional issue since no motion to quash on these grounds was filed prior to the beginning of trial in accordance with LSA-C.Cr.P. art. 535. However, defendant filed a motion to quash sentencing, arguing the statute was invalid. Thus, defendant raised one of the grounds for a motion in arrest of judgment; namely, the offense charged is not punishable under a valid statute. LSA-C.Cr.P. art. 859(2). LSA-C.Cr.P. art. 535 recognizes that this ground may also be urged as a basis for a motion in arrest of judgment. Furthermore, although styled as a motion to quash, the motion is in effect a motion in arrest of judgment.
Importantly, the Louisiana Supreme Court has consistently held:
the facial unconstitutionality of a statute on which a conviction is based is an error discoverable by the mere inspection of pleadings and proceedings, without inspection of the evidence, which is subject to appellate review under LSA-C.Cr.P. art. 920.
State v. Hoofkin, 596 So.2d 536, 536 (La. 1992).
For these reasons, we consider the issues raised.

CONSTITUTIONAL PRECEPTS
Constitutional scrutiny favors the statutes, which are presumed to be valid, and the constitutionality of a statute should be upheld whenever possible. Because a statute is presumed constitutional, the party challenging the statute bears the burden of proving its unconstitutionality. State v. Griffin, 495 So.2d 1306, 1308 (La. 1986).
In State v. David, 468 So.2d 1126, 1128 (La.1984), cert. denied, 476 U.S. 1130, 106 S.Ct. 1998, 90 L.Ed.2d 678 (1986) (citations omitted), the court articulated two statutory due process requirements: "(1) adequate notice to individuals that certain contemplated conduct is proscribed; and (2) adequate standards for those charged with determining the guilt or innocence of an accused."
In State v. Union Tank Car Co., 439 So.2d 377, 384-385 (La.1983), the Louisiana Supreme Court explained just what these two requirements entail:
In connection with the requirement of adequate notice, this court has held that a penal statute must describe unlawful conduct with sufficient particularity and clarity that ordinary men of reasonable intelligence are capable of discerning its meaning and conforming their conduct thereto. State v. Baron, 416 So.2d 537 (La.1982); State v. Dousay, 378 So.2d 414 (La.1979); State v. Payton, 361 So.2d 866 (La.1978). Likewise, the requirement of adequate standards for ascertaining guilt mandates that a criminal statute mark boundaries "sufficiently distinct for judges and juries to administer the law in accordance with the legislative will." City of Baton Rouge v. Norman, 290 So.2d 865, 868 (La.1974). As explained by this court in the case of State v. Dousay, 378 So.2d 414, 417 (La. 1979):
The constitutional requirement of definiteness is satisfied when the language of a criminal enactment `has a generally accepted meaning such that a person of ordinary intelligence would be given fair notice of what conduct is forbidden', State v. Defrances, 351 So.2d 133, 135 (La.1977), or when `the crucial words [or] phrases in the criminal statute have a fixed and definite meaning for the person of ordinary intelligence.' State v. Cloud, 248 La. 125, 130, 176 So.2d 620, 622 (1965)[.]
The criminal code itself requires that penal statutes must be strictly construed *1148 and cannot be extended to cases not included within the clear import of their language, and that nothing is a crime which is not clearly and unmistakably made a crime. La.R.S. 14:3, 14:7, State v. Truby, 211 La. 178, 29 So.2d 758 (La.1947)[.]

DOES LSA-R.S. 14:54 SET FORTH A PUNISHABLE OFFENSE, OR DOES IT MERELY DEFINE AN ATTEMPT UNDER LSA-R.S. 14:27?
State v. Eames, 365 So.2d 1361, 1363 (La.1978) explained:
An attempt is an inchoate offense. The crime of attempt is designed to punish certain activity which was not completed incipient criminal activity. It depends for its existence on a "specific intent to commit a crime." R.S. 14:27. If the definition of another crime includes the attempt to do something, the attempt statute, R.S. 14:27, cannot be employed, for then a defendant would be charged with an attempt to attempt to do an illegal act.
When presented with the issue of whether obscenity was in the nature of an attempt, the court in State v. Walters, 440 So.2d 115, 120-121 (La.1983), concluded otherwise, and elaborated:
Obscenity under Section 106A(1) is not an inchoate offense, since it requires the act of "exposure." Thus, defendants' argument that there can be no attempt to commit this offense, because the completed offense is itself in the nature of an attempt, has no merit.
Similarly, LSA-R.S. 14:54 is not an inchoate offense because it requires the act of "placing of any combustible or explosive material in or near any structure, watercraft, movable, or forestland, with the specific intent eventually to set fire to such structure, watercraft, movable, or forestland[.]"
Legislative history reveals the following. Originally, R.S. 1870,  845, 846, provided for two similar punishable offenses, as follows:
Sec. 845. Whoever shall attempt wilfully and maliciously to set fire to any house or building, or to set fire to any vessel, steamboat or other water-craft, shall, on conviction, be imprisoned at hard labor for not less than five nor more than ten years.
Sec. 846. Whoever shall be convicted of having maliciously prepared combustible materials and put them in any place with the intent to set fire to any house or building, or to a vessel, steamboat or other water-craft, the person thus convicted shall be sentenced to an imprisonment at hard labor for not less than five years nor more than fifteen years, although the said person had not yet set fire to the said combustible matters.
Section 846, the preparation and placing of combustible materials was the more severely punished offense.
Acts 1898, No. 153,  1 amended and reenacted Section 846 as follows:
Sec. 846. Whoever shall maliciously prepare combustible matter or explosive substances and put them in any place with the intent to set fire or to blow up or destroy any house or building, or ship, vessel, steam boat or other watercraft, shall upon conviction, suffer imprisonment at hard labor for not less than five years nor more than fifteen years, although the said person had not yet set fire to the said combustible matter or explosive substance [emphasis added].
At that time, unlike the present, the penalty provision was incorporated within the provision setting forth the charged offense. As explained in State v. Helle, 137 La. 388, 68 So. 735, 736 (1915),
This section prescribes a punishment for whoever has prepared combustible matter or explosive substances, and has put them in any place with the intention to blow up or destroy that place, even though he has not set fire to the explosive or combustible.

*1149 To constitute the offense one must put the explosive in the place to be destroyed, or, at least in a place near by[.]
Thus, the earlier provision, which did not include movables or any structure as included at present, made the offense, as defined in that section, (short of actually setting fire), a punishable offense. It is apparent the legislature considered the act of placing the combustible or explosive material with the intent to set fire as described in the statute, to constitute a punishable offense.
Acts 1928, No. 211,  5, 6 were part of comprehensive legislation, which enacted laws relative to crimes of burning or attempting to burn certain property, and repealed inconsistent former laws. Those sections provided:
Section 5. That any person who wilfully or maliciously attempts to set fire to or attempts to burn or to aid, counsel or procures the burning of any of the buildings or property mentioned in the foregoing sections, or who commits any act preliminary thereto or in furtherance thereof, shall upon conviction thereof be imprisoned at hard labor for not less than one nor more than two years or fined not to exceed one thousand dollars.
Section 6. That the placing or distributing of any inflammable, explosive or combustible material or substance, or any device, in any building or property mentioned in the foregoing sections in an arrangement or preparation with intent to eventually wilfully or maliciously set fire to or burn same, or to procure the setting fire to or burning of same, shall, for the purposes of this act, constitute an attempt to burn such building or property.
Thus, in 1928, the placing of combustibles was changed from a separately punishable offense, to a definition of attempt. However, the law still maintained a similar punishable offense as set forth in Section 5.
Acts 1932, No. 186,  2 amended and reenacted Section 6 of Act No. 211 of 1928 as follows:
Section 6. That the placing, distributing or igniting of any inflammable, explosive or combustible material or substance, or any device, in, under, on, or near any building or property mentioned in the foregoing sections in arrangement or preparation with intent to eventually wilfully or maliciously set fire to or burn same, or to procure the setting fire to or burning of same, shall, for the purpose of this act, constitute an attempt to burn such building or property. [emphasis added].
The Louisiana Criminal Code was adopted by the legislature as Act 43 of 1942. Acts 1942, No. 43,  1, Art. 54 again provided that the placing of combustible materials constituted and defined an attempt, instead of setting forth a punishable offense, as follows:
Art. 54. The placing of any combustible or explosive material in or near any structure, water craft, or movable, with the specific intent eventually to set fire to such structure, water craft, or movable, shall constitute an attempt to commit arson.
The comments to the article provided in part that:
This article is intended to make clear that any placing of materials with the intent to set fire to them, shall constitute an attempt to commit arson.
Acts 1944, No. 111,  1, amended and reenacted Article 54 and provided penalties, again providing for a punishable offense as follows:
Art. 54. The placing of any combustible or explosive material in or near any structure, water-craft, or movable, with the specific intent eventually to set fire to such structure, water-craft or movable, shall constitute a misdemeanor and upon conviction thereof such offender shall be fined not over Two Thousand Dollars ($2,000), or imprisoned for not more than five (5) years, or both.
In 1946, the legislature amended and reenacted Article 54 and that provision is *1150 similar to the current provision. Acts 1946, No. 305,  1 provided:
The placing of any combustible or explosive material in or near any structure, water craft, or movable, with the specific intent eventually to set fire to such structure, water craft, or movable, shall constitute an attempt to commit arson within the meaning of the Attempt Article (Article 27) of this Code, and the court shall look to Articles 51 through 53 of this Code in order to determine which type of Arson was attempted [emphasis added].
The 1946 amendment to Acts 1944, No. 111,  1 amended the penalty portion of the article.
The latest amendment and reenactment of Article 54 occurred by Acts 1970, No. 660,  1. The amendment added "forestland." LSA-R.S. 14:54. Section 2 of the act provided:
Section 2. If any provision or item of this Act or the application thereof is held invalid, such invalidity shall not affect other provisions, items or applications of this Act which can be given effect without the invalid provisions, items or applications, and to this end the provisions of this Act are hereby deemed severable.
Also in the same year, the legislature gave authority to the fire marshal, the first assistant fire marshal, each deputy fire marshal and state or municipal arson investigator, while engaged in the performance of their duties as such, to arrest individuals suspected of having violated certain criminal laws, including LSA-R.S. 14:51, 52, 53, and 54. LSA-R.S. 40:1562.1 (Acts 1970, No. 539,  1). The act also gave authority to arrest for any other criminal laws making unlawful an attempt or conspiracy to commit these offenses. Section 2 of the act additionally provided a severability clause as did LSA-R.S. 14:54. Although amended in 1997, the statute still provides arresting authority for 14:54. Acts 1997, No. 973,  1 (now LSA-R.S. 40:1563.1A(4) and (16)).
Thus, the legislative intent in 1970 was that 14:54 was a punishable offense. This intent was also made clear in 1997 when the legislature added LSA-R.S. 14:107.2, the Hate Crimes statute, Acts 1997, No. 1479,  2, as follows (in pertinent part):
A. It shall be unlawful for any person to select the victim of the following offenses against person and property because of actual or perceived race, age, gender, religion, color, creed, disability, sexual orientation, national origin, or ancestry of that person or the owner or occupant of that property or because of actual or perceived membership or service in, or employment with, an organization: [s]imple or aggravated arson; placing combustible materials [.]
B. If the underlying offense named in Subsection A of this Section is a misdemeanor, and the victim of the offense listed in Subsection A of this Section is selected in the manner proscribed by that Subsection, the offender may be fined not more than five hundred dollars or imprisoned for not more than six months, or both. This sentence shall run consecutively to the sentence for the underlying offense.
C. If the underlying offense named in Subsection A of this Section is a felony, and the victim of the offense listed in Subsection A of this Section is selected in the manner proscribed by that Subsection, the offender may be fined not more than five thousand dollars or imprisoned with or without hard labor for not more than five years, or both. This sentence shall run consecutively to the sentence for the underlying offense[.] [emphasis added].
The legislature determined that 14:54 was an underlying offense for the purposes of the Hate Crimes statute.
LSA-R.S. 14:54 does not express a penalty provision, but refers to LSA-R.S. 14:51 through 53 and the attempt statute. In State v. Piazza, 596 So.2d 817, 819-820 (La.1992), the court considered a conflict in the penalty portion of a statute, and *1151 held that when two or more interpretations of the penalties are possible, lenity directs the court to impose the least severe penalty. We find no conflicting penalty provisions in the sentencing portion of LSA-R.S. 14:54, and disagree with defendant that Piazza's rule of lenity requires this Court to apply the least severe penalty.
However, the Piazza court also enunciated principles of statutory construction, which we find applicable. In Piazza, the court explained that a court should give harmonious effect to all acts on a subject when reasonably possible because the legislature presumably intends to achieve a consistent body of law and theoretically it envisions the entire body of law when it enacts new legislation. The determinative question is whether the statutes can be reconciled with legislative intent. 596 So.2d at 819-820 (and cases cited therein).
LSA-R.S. 14:54 provides in pertinent part that the offense "shall constitute an attempt to commit arson within the meaning of the attempt article of this Code, and the court shall look at Articles 51 through 53 of this Code in order to determine which type of arson was attempted." Thus, the statute refers to LSA-R.S. 14:27, and 14:51 through 53. Having determined the legislative intent is that LSA-R.S. 14:54 is a punishable offense, we now determine, in light of Piazza, whether LSA-R.S. 14:54 can be reconciled with 14:51 through 14:53 and the attempt statute, 14:27.
Defendant argues that he was not given notice of the charges against him based on the statute's reference to LSA-R.S. 14:51 through 53, since the bill of information did not charge him with LSA-R.S. 14:51 through 53. The trial judge, in denying the motion, did not interpret the statute in that fashion. Instead, he considered the later portion of the statute as a legislative sentencing directive. We agree.
A sentencing directive is within the province of the trial judge, and not the jury. LSA-C.Cr.P. art. 871; State v. Lacoste, 256 La. 697, 237 So.2d 871, 874 (1970). Furthermore, the legislature has enunciated and recognized sentencing guidelines, which include the seriousness of the offense as a factor. See, LSC.Cr.P. art. 894.1A(3).
After considering the legislative history of LSA-R.S. 14:54, and the constitutional precepts, including the Piazza analysis, we conclude that LSA-R.S. 14:52 through 53 and 14:27 can be reconciled with 14:54. We hold that 14:54 provides a sentencing directive to the trial judge whereby the trial judge must consider LSA-R.S. 14:51 through 53, and 14:27 in determining the sentencing range. Thus, LSA-14:54 is facially valid since it charges a crime and not an inchoate offense.
Considering LSA-R.S. 14:51, 52, 52.1, 53, and 14:27D(3)[9] as required by 14:54, defendant's sentencing exposure for imprisonment ranged from no mandatory minimum, to be served with or without hard labor, and no statutory restriction that the sentence be served in part without benefit of parole, probation, or suspension of sentence (14:27D(3) and 14:52C, simple arson), to a maximum of ten years at hard labor (14:27D(3) and 14:51, aggravated arson), with one year of the sentence to be served without benefit of parole, probation, or suspension of sentence (14:27D(3), 14:51, aggravated arson and 14:52.1 simple arson of a religious building). In addition, a fine of no more than twelve thousand, five hundred dollars ($12,500.00) could be imposed (14:27D(3) and 14:51)).
We are mindful of the recent United States Supreme Court case, Apprendi v. New Jersey, ___ U.S. ___, 120 S.Ct. 2348, 2354-55, 2366-67, 147 L.Ed.2d 435 (2000), wherein the court declared a New Jersey statutory scheme for a Hate Crime unconstitutional. That scheme, unlike the Louisiana *1152 statute, allowed a court to impose a sentence exceeding the statutory maximum for the crime of conviction when the court found by a preponderance of the evidence that defendant was motivated by a statutorily-defined bias, which included race. A five-four court concluded that nay fact which increases the punishment for a crime above the statutory maximum, absent the fact of a prior conviction, is subject to the jury's determination of proof beyond a reasonable doubt. ___ U.S. ___, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435.
Apprendi is distinguishable since in that case the court found that defendant was exposed to a greater punishment on the basis of a judicial finding rather than the original jury verdict. ___ U.S. ___, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435. In this case, however, defeat was not exposed to a greater punishment on the basis of the judicial finding rather than the jury's verdict. The sentencing range for placing combustibles did not increase after conviction. The trial judge's finding was permissible sentencing discretion in taking into consideration various factors relating to the offense and the offender and in imposing a judgment within the range prescribed by statute. ___ U.S. ___, 120 S.Ct. 2348, 2357-58, 147 L.Ed.2d 435.[10]
LSA-R.S. 14:107.2
Defendant's motion to quash was based on the allegation the statute was being applied unequally by law enforcement agencies, in violation of constitutional equal protection. Defendant made no showing in the trial court to support the mere allegation. The trial judge properly denied the motion to quash since defendant failed to meet his burden of proof. Defendant did not make a prima facie showing that he was singled out for prosecution although others similarly situated, and who have committed the same acts, have not been prosecuted. See, State v. Mamon, 98-1943, p. 3 (La.App. 4 Cir. 9/8/99), 743 So.2d 766, 768-769 and the cases cited therein.
For the first time on appeal, defendant presents the additional argument that the statute is unconstitutionally vague. The state[11] argues this issue is not preserved. In response, defendant contends the reference to the vagueness of the statute in his motion for new trial sufficiently preserved the issue.
However, even if the argument was timely when filed as a motion for new trial, the motion only presents a particularized argument relative to LSA-R.S. 14:54. See, State v. Mansion, 98-992, p. 5 (La. App. 5 Cir. 4/27/99), 733 So.2d 1212, 1215. Moreover, at the hearing on the motion for new trial, defense counsel only addressed LSA-R.S. 14:54.
Nevertheless, even assuming the issue was preserved, there is no merit to the argument. Defendant asserts that the statute lacks objective guidelines for a juror to determine whether a Hate Crime has been committed. In particular, he contends the jury lacks standards for distinguishing the broad range of offenses to which Hate Crimes apply from those offenses for which the statute does not apply. Considering the above-stated constitutional precepts, outlined in Union Tank Car Co., 439 So.2d at 384-385,[12] the constitutional *1153 requirement of definiteness is satisfied since the jury could distinguish a Hate Crime from a non-Hate Crime. The language of the statute uses generally accepted meanings, words, or phrases, which have a fixed and definite meaning for the person of ordinary intelligence. The phrase, "because of actual or perceived race, age, gender, religion, color, creed, disability, sexual orientation, national origin, or ancestry," is such that a person of ordinary intelligence would be given fair notice of what conduct is subject to a Hate Crime.
This assignment lacks merit.

ASSIGNMENTS OF ERROR NUMBERS TWO AND THREE: VOIR DIRE
Defendant contends he was denied due process since the record on appeal did not contain the voir dire. The issue is moot, since the record was supplemented on appeal with the complete transcript of the voir dire.
Defendant raises the following voir dire issues: (1) the trial judge erred in refusing to permit defense counsel to question prospective jurors regarding the elements of aggravated arson; and, (2) the voir dire must be reviewed to determine whether there was sufficient questioning of prospective jurors regarding pre-trial publicity. Initially, we determine defendant's argument regarding questioning relative to the elements of aggravated arson lacks merit, having previously concluded the sentencing directive was within the province of the trial judge and not the jury.
During voir dire prospective jurors were questioned regarding media coverage, which included statements made by the Jefferson Parish Sheriff. A review of the voir dire reveals defendant, co-defendant and the state conducted extensive and thorough questioning on this issue. Thus, there was no limitation in questioning for potential bias with regard to pre-trial publicity.
These assignments lack merit.

ASSIGNMENT OF ERROR NUMBER FIVE: THE TRIAL JUDGE ERRED IN DENYING THE MOTION TO SUPPRESS DEFENDANTS STATEMENTS
Defendant objects to the introduction of certain statements allegedly made by him to Deputy Rogers on the basis they were irrelevant and highly prejudicial. The state's evidence revealed that after defendant was handcuffed, Deputy Rogers advised him of his constitutional rights. Thereafter, defendant called the deputy a "black mother fucking nigger," cursed and used additional racial epithets. While defendant was being transported in the officer's vehicle to the scene for the purpose of identification, defendant stated:
"You black mother fucking niggers don't think that we're watching you all, but we are."
The officer related:
[Defendant] said that the Civil War is going to come again. "We are four million strong." And that "Timothy McVey (sic) only blew up one building, but we're going to blow a whole city and kill a whole bunch more of you mother fucking niggers."
Defendant, denying he was read his rights, testified that the deputy asked him if he had any problem with black people and defendant told him that he did not have a problem with black people. He denied making the racial statements.
Defendant argues in brief that if the state alleged involvement in the Oklahoma bombing, it was required to conduct a Prieur[13] hearing, and if not alleged, then the statement was offered only to inflame the jury.
Defendant does not contend he was prejudiced by lack of written notice and *1154 admitted he had access to the police report, which contained the officers' statements. The state noted the statements had been previously provided to defendant and it filed written notice of its intent to use the statements out of an abundance of caution. Moreover, the objected-to statements regarding the Oklahoma bombing do not infer an association with the Timothy McVeigh bombing, but rather refer to threats toward African-Americans.
The issue is whether the threats toward African-Americans, the alleged racial targets of defendant's actions in the instant offense, allegedly made by defendant, shortly after his arrest, and while being transported to the scene for the purpose of identification, are admissible. The trial judge determined the statements were admissible.
The statements provide narrative completeness and form an integral part of the context facts in which the jury evaluated the state's case that defendant committed the offense of placing combustible materials because of actual or perceived race of the victims. LSA-R.S. 14:107.2A. As in State v. Colomb, 98-2813, pp. 3-4, 5 (La.10/1/99), 747 So.2d 1074, 1075-1076, 1077, it is clear the statement invited jurors to draw the necessary inferences for their verdict not on the basis of defendant's bad character, otherwise revealed by evidence of his prior convictions for possession of marijuana, burglary, and theft, but on the basis of his contemporaneous statements accompanying his capture and arrest.
Furthermore, in State v. Sanders, 97-892, pp. 2, 5 (La.App. 5 Cir. 3/25/98), 717 So.2d 234, 236, 237, writ denied, 98-1163 (La.9/25/98), 724 So.2d 774, defendant was convicted of possession of cocaine. This Court considered the admissibility of a threatening statement made to an arresting officer while the officer, after arresting defendant, was driving defendant to the jail. The officer testified defendant "spit" on the cage in the unit, and told the officer that he should not have let the officer handcuff him, and that if he had been able to get to his gun, he would have shot the officer. This Court held:
the admission that [defendant] engaged in several verbal threats of the arresting officer, was properly admitted as res gestae recitation of the facts of this encounter.
97-892 at 16-17, 717 So.2d at 242. Accord, State v. Laviolette, 576 So.2d 1000, 1007 (La.App. 3 Cir.) (on rehearing), writ denied, 581 So.2d 683 (La.1991) (wherein the court held that defendant's statements, which could be construed as offering a bribe to the arresting officers, were admissible. The statements were made shortly after defendant was arrested and taken to the police station).
This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER SIX: EXCESSIVE SENTENCE AND SENTENCING ERRORS PATENT
We pretermit a discussion of defendant's assigned error challenging the excessiveness of the sentences since we find sentencing errors patent requiring that the sentences be vacated and the case remanded for resentencing. Upon remand, defendant is not precluded from reurging a timely filed motion to reconsider sentence, if deemed necessary.[14]
For the conviction of placing combustible materials, the trial judge was required to sentence defendant within the statutory range of LSA-R.S. 14:51 through 14:53, and 14:27D(3).
As stated above, after considering defendant's sentencing exposure from LSA-R.S. *1155 14:51, 52, 52.1, 53, and 14:27D(3), as required by 14:54, defendant received the statutory maximum term of imprisonment, but did not receive any fine.
The trial judge imposed the ten-year sentence with two years to be served without benefit of parole, probation, or suspension of sentence. LSA-R.S. 14:54 provides in pertinent part, as a sentencing directive, that the offense "shall constitute an attempt to commit arson within the meaning of the attempt article [a]nd the court shall look at Articles 51 through 53[i]n order to determine which type of arson was attempted."
As part of the sentencing directive, the statute requires the trial court to also consider the attempt statute. Thus, defendant was subject to one-half of the two-year restriction. LSA-R.S. 14:27D(3). Accord, State v. Middlebrook, 409 So.2d 588, 592-593 (La.1982), wherein the court held one-half of the two-year restriction applied for sentencing under LSA-R.S. 14:27D(3) and 14:42.1B.
Thus, we vacate the sentence for the conviction of LSA-R.S. 14:54, and remand for resentencing.
Additionally, defendant was also sentenced to two counts of Hate Crimes. LSA-R.S.14:107.2. The Hate Crimes statute does not require the statutory restriction that the sentence be served without the benefit of probation, parole, or suspension of sentence. Here, the trial judge imposed the restrictions after he imposed all three sentences and failed to specify the limitation was only imposed on the LSA-R.S. 14:54 conviction in accordance with law. Thus, we vacate the two sentences on the Hate Crimes convictions as well, and remand for resentencing.
The trial judge imposed consecutive sentences. Despite defendant's and the state's suggestion in brief that the trial judge has sentencing discretion to impose consecutive sentences, LSA-R.S. 14:107.2C provides otherwise. The statute mandates that the sentences on the Hate Crimes convictions run consecutively to the sentence for the underlying offense of placing combustibles.
We note the trial judge failed to inform defendant of the prescriptive period for filing post-conviction relief and advise that on remand the trial judge should properly inform defendant of the newly-shortened two-year prescriptive period provided in LSA-C.Cr.P. art. 930.8. See, State v. Boles, 99-662, p. 7 (La.App. 5 Cir. 11/10/99), 750 So.2d 1059, 1062.
Finally, defendant's claim in assignment of error number 7, that cumulative errors require reversal lacks merit since, regardless of whether Louisiana recognizes cumulative errors, none of the assignments herein have merit.
Accordingly, for the reasons stated, the convictions are affirmed; the sentences are vacated; and the case is remanded for resentencing in accordance with the views expressed herein.
CONVICTIONS AFFIRMED; SENTENCES VACATED; CASE REMANDED WITH INSTRUCTIONS CONVICTIONS.
NOTES
[1] He is also referred to as "Frank G. Palermo, III."
[2] See the companion case of State v. Patrick Palermo, 99-1255 (La.App. 5 Cir. 7/25/00), 765 So.2d 1155, wherein some of the issues raised herein are similar or identical.
[3] See error patent discussion.
[4] The facts herein are identical to those in the companion case.
[5] The bill of information refers to him as "Kelly Cornell."
[6] See n. 2, infra.
[7] 596 So.2d 817 (La.1992).
[8] The State Attorney General was afforded the opportunity to address the challenges to LSA-R.S. 14:54 and 107.2. On May 5, 2000, that agency responded it would adopt the state's arguments.
[9] The attempt statute provides:

(3) In all other cases he shall be fined or imprisoned or both, in the same manner as for the offense attempted; such fine or imprisonment shall not exceed one-half of the largest fine, or one-half of the longest term of imprisonment prescribed for the offense so attempted, or both.
[10] We also find Castillo v. United States, ___ U.S. ___, 120 S.Ct. 2090, 2091, 2092, 2096, 147 L.Ed.2d 94 (2000) inapposite. In Castillo, the court considered a federal criminal statute prohibiting the use or carrying of a firearm in relation to a crime of violence. The statute provided for an enhanced penalty upon a finding by the trial judge that the weapon used was a "machinegun." The court considered whether "Congress intended the statutory references to particular firearm types ... to define a separate crime or simply to authorize an enhanced penalty." After considering, inter alia, principles of lenity and statutory construction, the court concluded that Congress intended the finding of a particular type of firearm to refer to an element of a separate, aggravated crime and not to a sentencing factor or directive.
[11] See note 8, infra.
[12] See also, State v. Byrd, 96-2302, pp. 11-13 (La.3/13/98), 708 So.2d 401, 408-409, cert. denied sub nom Peltier v. Louisiana, 525 U.S. 876, 119 S.Ct. 179, 142 L.Ed.2d 146 (1998).
[13] State v. Prieur, 277 So.2d 126 (La.1973).
[14] Defendant complains for the first time on appeal the trial judge failed to order a Presentence Investigation; however, no party requested the investigation and defendant does not assign this as error on appeal. On remand, defendant is not precluded from requesting the investigation, if necessary. The decision to order the investigation is within the discretion of the trial court. See, LSC.Cr.P. art. 875A(1); State v. Rose, 32,775, p. 2 (La.App. 2 Cir. 12/8/99), 750 So.2d 1085.